ACCEPTED
03-14-00709-CV
4141500
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/13/2015 11:06:49 AM
JEFFREY D. KYLE
CLERK

No. 03-14-00709-CV

IN THE
TEXAS COURT OF APPEALS
THIRD COURT OF APPEALS DISTRICT
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/13/2015 11:06:49 AM
JEFFREY D. KYLE
Clerk

ENTERGY TEXAS, INC.,

APPELLANT,

V.

PUBLIC UTILITY COMMISSION OF TEXAS,

APPELLEE

ON APPEAL FROM THE FINAL JUDGMENT
IN CAUSE NO. D-1-GN-13-003434
53RD JUDICIAL DISTRICT COURT, TRAVIS COUNTY, TEXAS,
HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

APPELLEE BRIEF AND APPENDIX OF THE
OFFICE OF PUBLIC UTILITY COUNSEL

OFFICE OF PUBLIC UTILITY COUNSEL
Tonya Baer
Public Counsel
State Bar No. 24026771

Sara J. Ferris
Senior Assistant Public Counsel
State Bar No. 50511915
P.O. Box 12397
Austin, Texas 78711-2397
512/936-7500 (Telephone)
512/936-7525 (Facsimile)
Sara.Ferris@opuc.texas.gov

ORAL ARGUMENT REQUESTED

February 13, 2015

TABLE OF CONTENTS ...................................................................................... i

INDEX OF AUTHORITIES...............................................................................iii

GLOSSARY OF ABBREVIATIONS AND TECHNICAL TERMS ............................... vi

STATEMENT REGARDING ORAL ARGUMENT ......................................................vii

ISSUES PRESENTED ..........................................................................................vii

    1. Did ETI waive its right to argue that non-eligible customers should pay the unrecovered costs under PURA § 39.452(b)? .......................... vii

    2. Did the Commission reasonably interpret the Competitive Generation Service (CGS) statute, PURA § 39.452(b), in harmony with ratemaking principles and PURA as entitling ETI to recover costs to implement and administer the CGS tariff, and further, that unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs not directly related to the CGS tariff?............................................................................vii

SUMMARY OF THE ARGUMENT .......................................................................1

ARGUMENT ...................................................................................................... 2

    1. ETI Waived Its Right to Argue that The Legislature Intended Other Classes to Pay The Unrecovered Costs Not Caused By Those Classes ..................................................................................... 2

    2. The Commission's Interpretation of PURA Section 39.452(b) as Calling for The Recovery of Costs to Implement and Administer the CGS Program and Excluding "Lost Revenues, Embedded Generation Costs or Other Types of Costs" is Reasonable and in Harmony With PURA as a Whole ...................................... 3

        a. *Standard of Review*...............................................................3

        b. *The Commission's interpretation should be upheld because it is reasonable and consistent with both the CGS statute and the regulatory scheme codified in PURA*..................................... 5

c. ETI's interpretation of PURA § 39.452(b) conflicts with other sections of PURA .................................................................................................7

d. The CGS statute's reference to discounted rates does not justify the violation of traditional ratemaking principles ..........................................10

e. ETI misinterprets the Legislature's use of particular words in PURA § 39.452(b) ..............................................................................16

f. Embedded production costs or lost revenues are not unrecovered costs authorized for recovery under PURA § 39.452(b) .......................................19

    1. An embedded production cost is a potential loss of revenue, not a cost as contemplated in PURA § 39.452(b). ..........................................19

    2. Lost revenues associated with embedded production costs are not costs, nor does the Legislature believe them to be costs..............................................................................................21

g. The High Plains decision is not informative on the question presented .......................25

PRAYER ............................................................................................................27

CERTIFICATE OF SERVICE ..............................................................................28

CERTIFICATE OF COMPLIANCE ......................................................................29

APPENDIX
- PURA – SELECT STATUTES
- PUC SUBST. RULE 25.234
- EXCERPT FROM APPLICATION OF GULF STATES UTILITIES COMPANY FOR AUTHORITY TO CHANGE RATES DOCKET NO. 3871, 7 P.U.C. BULL. 410 (SEP. 17, 1981)

# INDEX OF AUTHORITIES

<u>CASES</u>

*Acker v. Tex. Water Comm'n*
    790 S.W.2d 299 (Tex. 1990) ....................................................................10

*Black v. American Bankers Ins. Co.*
    478 S.W.2d 434 (Tex. 1972) ..................................................................... 6

*Centerpoint Energy Houston Electric, LLC v. Pub. Util. Comm'n of Texas*
    354 S.W.3d 899 (Tex. App – Austin 2011, no pet.) ..................................... 22, 24, 25

*Cities of Abilene v. Public Utility Comm'n*
    854 S.W.2d 932 (Tex. App.-Austin 1993, writ granted) .............................18

*Cities of Abilene v. Public Utility Comm'n*
    909 S.W.2d 493 (Tex. 1995) ....................................................................18

*City of San Antonio v. Fourth Court of Appeals*
    820 S.W. 2d 762 (Tex. 1991) ...................................................................13

*Clint Independent School Dist. v. Cash Invs.*
    970 S.W.2d 535 (Tex. 1998) ....................................................................12

*Griffin v. Oceanic Contractors, Inc.*
    458 U.S. 564 (1982) .................................................................................13

*Gulf States Utilities Co. v. State*
    46 S.W.2d 1018 (Tex. Civ. App.—Austin 1932, writ ref'd) ..................... 7

*Guthery v. Taylor*
    112 S.W.3d 715 (Tex. App. – Houston [14th Dist.] 2003, no pet.) .................... 24, 25

*Jessen Assocs. v. Bullock*
    531 S.W.2d 593 (Tex. 1976) ..................................................................... 5

*L.H. v. Tex. Dept. of Family and Protective Services*
    2014 WL 902555 (Tex. App.—Austin 2014, no pet.) ................................ 5

*L&M-Surco Mfg., Inc. v. Winn Tile Co.*
    580 S.W.2d 920 (Tex. Civ. App.-Tyler 1979, writ dism'd) ...................... 24

*Laidlaw Waste Systems v. City of Wilmer*
904 S.W.2d 656 (Tex. 1995) ...................................................................23

*Moss v. Bross*
221 S.W. 343 (Tex. Civ. App.—Austin 1920, no writ) ............................. 7

*Pioneer Natural Resources USA v. Public Utility Comm'n*
303 S.W.3d 363 (Tex. App.—Austin 2009, no pet.) ..............................15

*Public Utility Comm'n v. GTE-Southwest*
901 S.W.2d 401 (Tex. 1995) .............................................................14-15

*Railroad Commission v. High Plains Natural Gas Company*
628 S.W.2d 753 (Tex. 1981) .......................................................... 25, 26

*Sheshunoff v. Sheshunoff*
172 S.W.3d 686 (Tex. App. – Austin 2005, no pet.) .............................25

*Steering Committees for Cities Served by TXU Elec. v. Public Utility Comm'n,*
42 S.W.3d 296 (Tex. App.–Austin, 2001, no pet.) ................................. 4

*Taylor v. Firemen's and Policemen's Civil Service Comm'n*
616 S.W.2d 187 (Tex. 1981) .................................................................. 5

*Texas Dept. of Transp. v. City of Sunset Valley*
8 S.W.3d 727 (Tex. App.—Austin 1999, no pet.) .................................. 7

*Tex. Health Ins. Risk Pool v. Southwest Service Life Ins. Co.*
272 S.W.3d 797 (Tex. App.—Austin 2008, no pet.) ....................10, 12, 16

*Tex. Mun. Power Agency v. Public Utility Comm'n*
253 S.W.3d 184 (Tex. 2007) ............................................................4, 5

## TEXAS STATUTES

Tex. Gov't Code § 311.011(b) ................................................................ 16-17

Gas Utility Regulatory Act (GURA), Tex. Util. Code §§ 101.001-105.051 .........15, 25

Public Utility Regulatory Act (PURA), Tex. Util. Code §§ 11.001-66.017 ................... 1

PURA § 11.002 ................................................................................. 7, 8

PURA § 11.003(16)(A) ......................................................................... 7

PURA § 11.008 ............................................................................................ 7

PURA § 36.003 ............................................................................................ 8

PURA § 36.003(a) ....................................................................................... 8

PURA § 36.003(c) ....................................................................................... 8

PURA § 36.007 .............................................................. 10, 11, 13, 14, 16

PURA § 36.051 ............................................................................ 15, 19, 21

PURA § 36.201 .................................................................................... 15, 26

PURA § 39.452(b) .............................. 1, 2, 3, 5, 6, 7, 10, 11, 13, 15, 16, 19, 20, 21, 23, 24, 25

PURA § 39.905 ........................................................................................ 24, 25

PURA Chapter 55 .................................................................................... 22, 23

PURA § 55.048 ........................................................................................ 22, 23

## PUBLIC UTILITY COMMISSION OF TEXAS RULES

16 Tex. Admin. Code § 25.234(b) .......................................................... 15

## ADMINISTRATIVE PROCEEDINGS

*Application of Gulf States Utilities Company for Authority to Change Rates*
    Docket No. 3871, 7 P.U.C. Bull. 410 (Sep. 17, 1981) .............................. 17, 18

## LEARNED TREATISE

67 Tex. Jur. 3d *Statutes* § 160 (2015) .................................................... 7

# GLOSSARY OF ABBREVIATIONS AND TECHNICAL TERMS

**APA** – Administrative Procedure Act, Tex. Gov't Code §§ 2001.001-.902

**AR** – Administrative Record. In this brief, reference to the Administrative Record will be AR, Binder "X", Item No. "X" or Party Exhibit No. "X." The supplemental portion of the Administrative Record will be referenced as AR, Docket No. 37744 Binder "X", Item No. "X" or Party Exhibit No. "X."

**CGS** – Competitive Generation Service

**CGS Statute** – PURA § 39.452(b)

**CGSC Rider** – Competitive Generation Service Costs Rider – the mechanism approved for recovering the costs of implementing and administering the CGS program.

**Commission or PUC** – Public Utility Commission of Texas

**Company** – Entergy Texas, Inc.

**Docket No. 37744** – The rate case from which the CGS issues were severed

**Docket No. 38951** – The PUC docket underlying this appeal

**Embedded Costs** – Costs taken into account when setting the utility's rates. Embedded costs are functionalized as transmission, distribution, or generation/production related costs.

**Entergy** – Entergy Corporation, ETI's parent company

**ETI** – Entergy Texas, Inc.

**GURA** – *Gas Utility Regulatory Act*, Tex. Util. Code §§ 101.001-105.051

**OPUC** – Office of Public Utility Counsel

**Order** – The final and appealable order of the Commission in Docket No. 38951 signed on July 19, 2013, from which ETI appeals

**PURA** – *Public Utility Regulatory Act*, Tex. Util. Code §§ 11.001 – 66.017

**SOAH** – State Office of Administrative Hearings

**Test Year** – July 1, 2008 through June 30, 2009

**TIEC** – Texas Industrial Electric Consumers

## STATEMENT REGARDING ORAL ARGUMENT

The Court should permit oral argument. This case concerns the construction of Section 39.452(b) and other related sections of the *Public Utility Regulatory Act* ("PURA"), codified in the Texas Utilities Code.[1] Like most cases involving public utility regulation, this case is complex; oral argument will assist the Court in clarifying the law and facts of the case.

## ISSUES PRESENTED

1. Did ETI waive its right to argue that non-eligible customers should pay the unrecovered costs under PURA § 39.452(b)?

2. Did the Commission reasonably interpret the Competitive Generation Service (CGS) statute, PURA § 39.452(b), in harmony with ratemaking principles and PURA as entitling ETI to recover costs to implement and administer the CGS tariff, and further, that unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs not directly related to the CGS tariff?

---

[1] *Public Utility Regulatory Act*, Tex. Util. Code Ann. §§ 11.001-66.017 (West 2007 & Supp. 2014).

SUMMARY OF THE ARGUMENT

The core of Entergy Texas, Inc.'s (ETI's) disagreement with the Order of the Public Utility Commission of Texas (Commission) is the Commission's interpretation of the Competitive Generation Service (CGS) statute, PURA § 39.452(b), and more specifically, what the Legislature meant by "recover any costs unrecovered as a result of the implementation of the tariff."[2] The Commission reasonably interpreted this provision in harmony with ratemaking principles and PURA to mean that ETI is entitled to recover costs to implement and administer the CGS program tariff, and that such "unrecovered" costs do not include lost revenues, embedded generation costs, or any other types of costs not directly related to the CGS tariff.[3] ETI's argument that it is entitled under the CGS statute to recover embedded production costs is based on its own statutory interpretation that conflicts with other provisions of PURA and would result in inequitable or absurd results, and should be rejected.[4]

---

[2] Public Utility Regulatory Act (PURA), Tex. Util. Code §§ 11.001-66.017.

[3] When a cost is embedded, it means that it was taken into account when setting the utility's rates. Embedded costs are functionalized as transmission, distribution, or generation/production related costs.

[4] The embedded costs at issue have been referred to by the Commission as "embedded generation costs" and by ETI as "embedded production costs." The terms are interchangeable for purposes of the issue presented and OPUC will refer to "embedded production costs" unless citing to the Commission's Order.

ARGUMENT

**1. ETI Waived Its Right to Argue that The Legislature Intended Other Classes to Pay The Unrecovered Costs Not Caused By Those Classes.**

ETI argues on pages 12-13 and 18-19 of its Appellant's Brief that the Legislature "opened the door" for, or even "required" non-eligible customers to pay "for the special deal it authorized for certain customers." ETI presumably argues this to counter any argument that ETI's preferred definition of unrecovered costs would place too large a burden on the CGS customers who will be paying those costs through the CGSC Tariff. The Legislature made no such mandate, and ETI has waived its right to make this argument. In the proceeding below, ETI officially stood unopposed to an April 13, 2012 stipulation among other parties which stated that the unrecovered costs were to be borne solely by the CGS customers.[5] If ETI was convinced that the CGS statute requires that the other classes bear the costs, then ETI could not properly have been unopposed to a statutory violation. ETI's current position is also belied by a statement it made earlier in the process. ETI admitted during a hearing on the merits on the CGS issue in PUC Docket No. 37744 that nothing in PURA § 39.452(b) prohibits ETI from charging CGS participants the unrecovered costs.[6]

Further, ETI itself proposed charging the unrecovered costs to the eligible

---

[5] AR, Binder 2, Item No. 119, *Application of Entergy Texas, Inc. For Approval of Competitive Generation Service Tariff (Issues Severed from Docket No. 37744)*, Docket No. 38951, Order at 3 (Jul. 19, 2013).

[6] AR, Docket No. 37744 Binder 4, Vol. D, Hearing on the Merits Transcript Volume 3 at 177-178 (May Cross-Examination) (Jul. 16, 2010).

classes (LIPS and LIPS-TOD) in the event there are no CGS subscribers.[7] Adopting tariff language proposed by ETI, the Commission found that ETI should be allowed to recover CGSC rider costs even if there are no subscribers to the CGS program.[8] The Commission continued and found that "those costs should be borne by the customer class that the program was designed to benefit—the LIPS and LIPS–TOD customers—the customers eligible to participate in the program."[9] Recovering the unrecovered costs from the CGS customers or the classes for whom the CGS program was designed to benefit is consistent with cost causation principles and PURA. ETI has waived its right to stray from this recovery plan adopted by the Commission, and its argument that the Legislature mandates a different recovery scheme should be rejected as without merit.

2. **The Commission's Interpretation of PURA Section 39.452(b) as Calling for The Recovery of Costs to Implement and Administer the CGS Program and Excluding "Lost Revenues, Embedded Generation Costs or Other Types of Costs" is Reasonable and in Harmony With PURA as a Whole.**

   a. *Standard of Review*

   The second issue before the Court is one of statutory construction. The CGS statute is ambiguous in that it contains words or phrases that are not clearly defined, such as "eligible customer," "implementation," and "unrecovered as a

---

[7] AR, Binder 2, Item No. 119, Order at 9.
[8] *Id.*
[9] *Id.*

result of."[10] The standard of review for statutory construction is set forth in *Texas Municipal Power Agency v. Public Utility Commission of Texas.*[11] In *Texas Municipal Power Agency*, the Court stated that, "[s]tatutory construction is a question of law, which we review de novo."[12] The Court further stated that, "[i]n ascertaining the scope of an agency's authority, we give great weight to the agency's own construction of a statute.[13] In *Steering Committees for Cities Served by TXU Elec. v. Public Utility Comm'n*, 42 S.W.3d 296 (Tex. App.–Austin, 2001, no pet.), this Court considered the deference due the Public Utility Commission's interpretation of a PURA provision the Commission is charged with enforcing. The Court stated:

> Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, as long as the construction is reasonable and does not contradict the plain language of the statute. This is particularly true when the statute involves complex subject matter. As long as the agency's ruling is a reasonable reading of the statute, this Court will affirm if that reading is in harmony with the rest of the statute, even if other reasonable interpretations exist. We do not look at individual provisions of the statute in isolation; rather, we construe the statute as a whole. In construing a statute, our objective is to determine and give effect to the legislature's intent.[14]

---

[10] The issue of what is meant by "eligible customer" is not before the Court in this appeal; after two years of debate, an agreement was reached regarding which customers are eligible to participate in the CGS program approved in Docket No. 38951. AR, Binder 1, Item No. 71, Stipulation on Unresolved Issue No. 2 (Apr. 18, 2012). The stipulation was adopted in the Commission's Interim Order. AR, Binder 1, Item No. 77 at 5, Interim Order (Jun. 12, 2012).

[11] 253 S.W.3d 184 (Tex. 2007).

[12] *Id.* at 192.

[13] *Id.* at 192.

[14] 42 S.W.3d at 300 (citations omitted).

Further, in a recently issued opinion, the Third Court of Appeals cited to *Texas Municipal Power Agency* and then recited another cardinal statutory construction principle: "We begin then with the plain language of [the section], reviewing it in the context of the broader statutory scheme."[15] The Commission's construction of PURA § 39.452(b) is entitled to deference, and when reviewed in context of the broader statutory scheme of PURA, its reasonableness becomes manifest.

b. *The Commission's interpretation should be upheld because it is reasonable and consistent with both the CGS statute and the regulatory scheme codified in PURA.*

The Commission's Order properly allows ETI to recover implementation and administration costs that are "incurred as a result of the implementation" of the CGS Tariff. While ETI claims that the Commission misinterprets the CGS statute, PURA Section 39.452(b), the Commission's interpretation is reasonable, and is consistent with both the statute and the regulatory scheme codified in PURA. A fundamental rule of statutory construction is to ascertain and give effect to the intent of the Legislature.[16] One must look to the entire Act in determining the Legislature's intent with respect to a specific provision.[17] The Texas Supreme Court has stated that "all sections, words and phrases of an entire act must be

[15] *L.H. v. Texas Dept. of Family and Protective Services*, 2014 WL 902555 at *1 (Tex. App.—Austin 2014, no pet.) (Mem. Op.).
[16] *Jessen Assocs. v. Bullock*, 531 S.W.2d 593, 599 (Tex. 1976).
[17] *Taylor v. Firemen's and Policemen's Civil Service Comm'n*, 616 S.W.2d 187, 190 (Tex. 1981).

considered together . . . to produce a harmonious whole; and one provision will not be given a meaning out of harmony or inconsistent with other provisions . . . ."[18]

The Legislature's intent as manifested in PURA is consistent with traditional ratemaking principles and should not be read in a way that conflicts with cost causation principles. Nor should PURA § 39.452(b) be read in a manner that conflicts with the express language of PURA or that would lead to absurd or inequitable results. ETI's interpretation of PURA § 39.452(b) conflicts with established ratemaking principles such as cost causation and would lead either to an absurd or an inequitable result.

ETI claims that it is entitled under the CGS statute to recover its embedded production costs. If these costs were defined as "unrecovered" costs and ETI were to recover those costs from classes not eligible to participate in the CGS program (non-eligible classes), it would result in inequity because it is undisputed that those classes did not cause these costs. ETI's definition would create an unreasonable cross-subsidization, violating the principle of cost causation and would be an absurd result. Likewise, if ETI were to recover embedded production costs solely from the CGS customers as "unrecovered" costs, it would also lead to an absurd result because it would nullify the very benefit the statute was designed to create for those customers. In contrast with ETI's preferred interpretation, the

---

[18] *Black v. American Bankers Ins. Co.*, 478 S.W.2d 434, 437 (Tex. 1972).

Commission's Order reasonably interprets the CGS statute in harmony with the rest of PURA and should be affirmed.

In addition, PURA is to be construed broadly according to PURA § 11.008. However, exceptions to the general scheme are to be construed narrowly.[19] PURA Section 39.452(b) is an exception to the general ratemaking scheme for regulated utilities under PURA wherein utilities such as ETI procure generation on behalf of their customers. Section 39.452(b) allows certain "eligible" customers to contract for competitive generation on their own. Thus, when looking at PURA § 39.452(b) and determining what costs the Legislature intended ETI to recover, the Court must construe the meaning of this statute narrowly, not with the broad brush ETI seeks to have the Court employ.

c. *ETI's interpretation of PURA § 39.452(b) conflicts with other sections of PURA.*

PURA Section 11.002 provides that the purpose behind PURA itself is to "assure rates, operations and services are just and reasonable *to the consumer* and *to the utilities*."[20] (Emphasis added.) ETI's interpretation of the CGS statute, as expressed in its Appellant's Brief, holds its shareholders harmless for lost revenues

---

[19] *Gulf States Utilities Co. v. State*, 46 S.W.2d 1018, 1026 (Tex. Civ. App.—Austin 1932, writ ref'd); *Moss v. Bross*, 221 S.W. 343, 344 (Tex. Civ. App.—Austin 1920, no writ); 67 Tex. Jur. 3d *Statutes* § 160 (2015); *see, e.g., Texas Dept. of Transp. v. City of Sunset Valley*, 8 S.W.3d 727, 730 (Tex. App.—Austin 1999, no pet.) (strictly construing statute that is narrow exception to general rule).

[20] Tariffs such as ETI's CGS and proposed CGSC tariffs fall within the definition of "rate" in PURA Section 11.003(16)(A).

and costs unrecovered as a result of the implementation of the CGS tariff but does not extend that protection to the non-CGS ratepayers such as residential and small commercial customers. Thus, only half of the stated purpose enunciated in PURA § 11.002 is effectuated under ETI's reading of the CGS statute. PURA Section 36.003(a) also requires the PUC to ensure that *each* rate ETI makes, demands or receives is just and reasonable. Consistent with PURA § 11.002, PURA § 36.003 goes further and prohibits rates from being unreasonably preferential, prejudicial or discriminatory, and requires said rates to be sufficient, equitable and consistent in application to each class of consumers. PURA Subsection 36.003(c) prohibits ETI from granting an unreasonable preference or advantage to a person (with)in a classification, and ETI is also prohibited from subjecting a person in a classification to an unreasonable prejudice or disadvantage concerning rates; or establishing or maintaining an unreasonable difference concerning rates between localities or between classes of service.

ETI asserts on pages 12–13 and 18–19 of its brief that the Legislature mandated or expressly allowed for the shifting of unrecovered costs associated with the CGS tariff to customer classes that are not eligible to participate in the CGS program and do not benefit from the program. ETI's interpretation should be rejected because it is in conflict with other sections of PURA. Namely, ETI's interpretation of the CGS statute would violate PURA §§ 11.002 and 36.003

because one class of customers would be subsidized by other customer classes, thus granting the subsidized customers an unnecessary and unreasonable preference. It was this unfair shifting of costs that persuaded the Administrative Law Judge (ALJ) in the original hearing on the merits to recommend rejecting the CGS tariff.[21] Page two of the Proposal for Decision (PFD) states: "The ALJ's primary reasons for recommending rejection of the proposal echoes the opponents' arguments: the anticipated costs are not ascertainable until the program has been implemented; and these potentially substantial costs are shifted to parties who may choose not to, or are not eligible to, participate in the program." On the next page of the PFD, the ALJ continued, stating: "ETI's proposal shifts the bulk of these unrecovered costs to all non-participating customers. This cost-shifting violates the basic principal of cost-causation. Although the parties offered some discussion of legislative intent, the ALJ is not convinced that this cost-shifting was intended by the Legislature."[22]

The Commission's interpretation of the CGS statute embodied in its final order in Docket No. 38951 does not conflict with other sections of PURA and instead harmonizes the CGS statute with PURA as a whole. Because the Commission's interpretation and application of the CGS statute is reasonable and

---

[21] AR, Docket No. 37744 Binder 2, Item No. 36, Proposal for Decision (PFD) at 2-3, 25, 41-42 (Oct. 4, 2010).
[22] *Id.* at 3.

9

does not conflict with PURA, the Commission's Order should be affirmed.

> ### d. The CGS statute's reference to discounted rates does not justify the violation of traditional ratemaking principles.

On page ten of the Appellant's Brief, ETI makes an unsupported assumption regarding the purpose behind including a prohibition in the CGS statute against treating CGS tariffs as offering a discounted rate or rates under PURA § 36.007. ETI takes the inclusion of this prohibition to mean that the Company may force its other, non-CGS customers to pay for any and all "unrecovered" costs (as defined by ETI), and that the Company's shareholders are immune from shouldering any responsibility for such costs. ETI misinterprets PURA § 39.452(b) and focuses too narrowly on only one subsection of PURA § 36.007.

When the Legislature refers to a specific statute as it did in PURA § 39.452(b) by referring to § 36.007, it is presumed that the Legislature has knowledge of how that statute has been interpreted and implemented. "A statute is presumed to have been enacted by the [L]egislature with complete knowledge of existing law and with reference to it."[23] "We must presume that the [L]egislature is aware of how a particular industry operates when passing laws regulating that industry."[24]

When referring to discounted rates under PURA § 36.007 in the CGS

---

[23] *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990).
[24] *Tex. Health Ins. Risk Pool v. Southwest Service Life Ins. Co.*, 272 S.W.3d 797, 802 (Tex. App.—Austin 2008, no pet.).

statute, the Legislature did not point to a specific subsection of PURA § 36.007 but rather to the section as a whole. PURA Section 36.007 includes three provisions that call for creating a rate for certain customers based upon a utility's marginal capacity or energy costs. Viewing PURA § 36.007 in its entirety, it is reasonable to interpret the Legislature's reference to this statute in PURA § 39.452(b) as proscribing the use of marginal costs, or the § 36.007 marginal cost computation, as the basis for calculating CGS rates, and anticipating that the rates would instead reflect the bargains struck by CGS customers in their respective competitive generation contracts.

PURA Section 36.007 authorizes a utility to charge a discounted rate to certain customers so long as the rate is sufficient to cover the utility's marginal costs, and the rate may not be unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive. Discounted rates are intended to permit a utility to use lower marginal cost-based rates in order to encourage additional sales, oftentimes to encourage economic development. The discounted rate is available to utilities to boost sales from customers that might not ordinarily purchase as much power at the full authorized rate. By stating that the CGS tariff may not offer a discounted rate or rates, the Legislature mandated that ETI not be permitted to offer to CGS customers a set amount or set percentage discount off of the rate they would have paid as LIPS or LIPS-TOD customers merely by enrolling

in the CGS program.

Further, the Public Utility Commission's treatment of discounted rates is based upon intentionally creating an inadequate assignment of costs and has nothing to do with declining billing determinants, *i.e.* it has nothing to do with protecting the utility from the effects of loss of load. If a rate is determined to be a discounted rate, for purposes of developing test year cost of service in a rate case, the Commission imputes a full allocation of cost to that class of customers as if the discount didn't exist, thereby ensuring that the allocable costs of the discounted rate customers are not re-allocated to other customer classes.

When the Legislature stated that the CGS program is not a discounted rate, the intent was not to reallocate the costs to serve CGS customers to non-eligible customers of the utility. Such an interpretation goes far beyond a plain reading of the statute, which only requires that the CGS rates be based upon the CGS customers' full cost of service. ETI's interpretation is also inconsistent with other relevant PURA sections, PURA as a whole, and the ratemaking principles Texas has long employed when implementing PURA. Statutes are not to be viewed in isolation but are instead to be read in context with the act as a whole and with awareness of how the particular industry operates.[25]

---

[25] *See Clint Indep. Sch. Dist. v. Cash Invs.*, 970 S.W.2d 535, 539 (Tex. 1998) ("Courts should not assign a meaning to a provision that would be inconsistent with other provisions in the act.); *Tex. Health Ins. Risk Pool v. Southwest Service Life Ins. Co.*, 272 S.W.3d at 802 ("[L]egislature is aware of how a particular industry operates when passing laws regulating that industry.").

Moreover, ETI's interpretation leads to absurd results. Courts have clearly established that, absent a clear legislative directive, a statute should not be construed to produce an absurd or foolish result if it is reasonably susceptible to an alternative construction.[26] Given that the CGS program may not be considered to offer a discount rate under PURA § 39.452(b), and discount rates under PURA § 36.007 may not be unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive, under ETI's argument, the CGS program tariffs would be permitted, "invited" or even "required" to be unreasonably preferential, prejudicial, discriminatory, and predatory.[27] Such an interpretation results in a law that would be invalidated as contrary to public policy. ETI's interpretation should be rejected in favor of the Commission's reasonable interpretation.

Further, any claimed potential harm to ETI can be ameliorated. During the next rate case after ETI implements the CGS tariff, if the CGS rate causes a revenue loss, ETI will be made whole because the reduced billing determinants (if any) associated with the LIPS and LIPS-TOD classes will be captured when the newly established rates become effective.[28] If the CGS rate were subject to the

---

[26] *City of San Antonio v. Fourth Court of Appeals*, 820 S.W.2d 762, 768 (Tex. 1991) *citing Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

[27] *See* Appellant's Brief at 18 ("That invitation is embodied in the legislature's reference in the CGS statute to another provision of PURA — section 36.007."); *Id.* at 19 ("The Commission and Intervenors have characterized the assignment of costs to non-participating customers as unfair. These arguments ignore that the legislature – not ETI – has required this result.").

[28] Under the stipulations approved by the Commission in its Order, the LIPS and LIPS-TOD classes are the customers eligible to participate in the CGS program. AR, Binder 2, Item No. 119,

13

discounted rate provisions of PURA § 36.007, fully allocated costs would be imputed to the CGS rate in the next rate case, and ETI would absorb the difference between the imputed cost and actual revenues. However, the Commission Order in no way implements such a revenue imputation. If ETI wished to be insulated from reduced billing demands which occur between the effective date of the rates in place at the time of the Order at issue and the next rate case, it should have presented and supported a known and measurable adjustment to test year billing determinants which reflects any expected loss of load due to CGS. ETI did not do so.

As the Company is aware, only known and measurable adjustments to test year billing units are allowed. The Texas Supreme Court has explained the process of ratemaking and the use of a historic test year with known and measurable changes:

> Ratemaking begins with an historic test year. Although the use of historic data adds some certainty, this does not mean that the process begins with actual cash paid by the utility. Because utilities use accrual accounting, the books and records include certain expenses—such as pension, depreciation and nuclear decommissioning expenses—that are estimated allocations to the period in question. Since the rates are to be charged in the future, the historic test year amounts must be adjusted to more accurately reflect costs which will be incurred in the future. These adjustments include normalizing and prospective adjustments such as removing non-recurring expenses, modifying test year data to reflect the number of customers served at

*Application of Entergy Texas, Inc. For Approval of Competitive Generation Service Tariff (Issues Severed from Docket No. 37744)*, Docket No. 38951, Order at 9 and 16, Finding of Fact No. 32 (Jul. 19, 2013).

the end of the period and modifying expenses and rate base for known and measurable changes.[29]

No utility is guaranteed a certain level of revenues or a certain return. The Third Court of Appeals recognized in 2009 that, "electric utility rates are established through a regulatory process with a goal of permitting the utility 'a reasonable opportunity to earn a reasonable return.'"[30] In enacting the CGS statute, PURA § 39.452(b), the Legislature evinced no intent to override these ratemaking principles which are also found in the Commission's rules. Commission Substantive Rule 25.234(b) states in pertinent part that "[r]ates will be determined using revenues, billing and usage data for a historical test year adjusted for known and measurable changes . . . ."[31]

In addition to exhibiting no intent to override the ratemaking principles embodied in the Commission's rules, the CGS statute neither mentions nor implies any exception or exclusion to PURA § 36.201's prohibition against automatic pass-through adjustments.[32] Thus, it must be assumed that the Legislature expected traditional rate case procedures to apply – in which case, only known *and* measurable adjustments to test year billing units are allowed.

---

[29] *Public Utility Comm'n of Texas v. GTE-Southwest*, 901 S.W.2d 401, 411 (Tex. 1995).

[30] *Pioneer Natural Resources USA v. Public Utility Comm'n*, 303 S.W.3d 363, 366 (Tex. App.—Austin 2009, no pet.) *quoting* Tex. Util. Code § 36.051.

[31] 16 Tex. Admin. Code § 25.234(b).

[32] In contrast, GURA, which governs the Railroad Commission's gas services regulation, contains no such prohibition against automatic pass-through adjustments. Gas Utility Regulatory Act (GURA), Tex. Util. Code §§ 101.001-105.051 (West 2007 & Supp. 2014).

### e. ETI misinterprets the Legislature's use of particular words in PURA § 39.452(b).

On page sixteen of the Appellant's Brief, ETI interprets the use of the word "any" in the phrase "recover any costs unrecovered as a result of the implementation of the tariff" expansively to mean that there are no limitations or restrictions whatsoever on the costs ETI is entitled to recover. A more reasonable interpretation of the Legislature's use of the word "any" in the CGS statutory phrase "recover any costs unrecovered as a result of the implementation of the tariff" would take into consideration the traditional ratemaking principles contemplated by the statute.[33]

ETI also fails to give the word "recover" in the same statutory phrase its proper meaning, instead focusing on the partial phrase, "unrecovered as a result" in isolation from the rest of the sentence. The sentence as a whole reads: "The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007, and the utility's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff." The word "recover" should not be overlooked or given a new meaning which is different than the common understanding of the term in rate-making proceedings. The Code Construction Act states that "[w]ords and phrases that have acquired a technical or particular meaning,

---

[33] *See Tex. Health Ins. Risk Pool v. Southwest Service Life Ins. Co.*, 272 S.W.3d at 802.

16

whether by legislative definition or otherwise, shall be construed accordingly."[34]

"Recover" or "Recovery" in the context of rate-making refers to the test year cost of service; costs and revenues will fluctuate after rates are set but the cost of service process makes no attempt to determine whether specific costs were recovered between rate cases. How the word "recover" is used in cost of service ratemaking is explained on Page 81 of OPUC Witness Clarence Johnson's direct testimony.[35] Mr. Johnson cites the Hearing Examiner's explanation of cost of service ratemaking in (ETI's predecessor) Gulf States Utilities' rate case, PUC Docket No. 3871, which was subsequently adopted as a statement of Commission Policy:[36]

> Historic test year is used to approximate the utility's anticipated cost of operation during the period when rates will be in effect. When necessary to reflect changes in conditions since the test year, adjustments can be made to those historical costs for known and measurable costs which are *certain* to be incurred. Still there is a matching of expense and revenues.

And further,

> If the actual incurred expense in question or a similar expense cannot be anticipated to reoccur with any

---

[34] Tex. Gov't Code § 311.011(b).

[35] AR, Docket No. 37744 Binder 4, OPC Exhibit No. 1, Direct Testimony of Clarence Johnson.

[36] When issuing the Order in Docket No. 3871, the PUC included Ordering Paragraph No. 8 which stated: "The Examiner's discussion of the purpose for establishing a cost of service for ratemaking purposes found in § I (C) of the Examiner's Report is concurred with by the Commission and shall be adopted as a policy statement of the Commission. The Commission's Director of Public Utilities shall take such steps as are necessary to carry out this directive." Docket No. 3871, Order at 450.

reasonable certainty within a given period, no allowance for the expense shall be made in the cost of service. *It is not a question of not allowing the utility to recover the expense with future revenues. The expense should have been recovered by revenues collected at the time the expense was incurred. Since ratemaking is not an exact science, often the expense is not recovered. This is not confiscation; it is a risk of doing business. The utility is compensated for this risk when the regulatory authority establishes a return on the utility's adjusted value of invested capital.*[37]

The Commission's adopted policy statement continued and said that this policy of establishing a cost of service is "inherent" in test year rate-making.[38] Texas courts have further explained how costs are treated in test year rate-making:

> In this case, as in ordinary rate cases, rates are fixed until the next rate case. The inquiry into reasonable operating costs is a "snapshot" inquiry based on the test year. It is not intended to account for future cost changes. Adjustment for these changes will be made in future rate cases.[39]

ETI's argument implies that the Legislature changed the longstanding concept of "recovery" inherent in test year cost of service rate-making. No express language in the CGS statute supports ETI's interpretation that new or additional forms of recovery were intended. The Commission's Order approved the implementation of the CGS rider but it expressly left for another day the issue of

---

[37] *Application of Gulf States Utilities Company for Authority to Change Rates*, Docket No. 3871, 7 P.U.C. Bull. 410, 414-15 (Sept. 17, 1981) [emphasis added].

[38] *Id.*

[39] *Cities of Abilene v. Public Utility Comm'n of Texas*, 854 S.W.2d 932, 943 (Tex. App.-Austin 1993, writ granted), *aff'd in part, rev'd in part on other grounds, Cities of Abilene v. Public Utility Comm'n of Texas*, 909 S.W.2d 493 (Tex. 1995).

18

the amount of implementation and administration costs that would be recovered in the CGSC rider.[40] When ETI later files an application for the CGSC rider to recover its implementation and administration costs, it will have the burden of showing that the costs it seeks to recover through the CGSC rider are in fact unrecovered. If ETI meets that burden, then ETI will be able to recover those costs.

### f. *Embedded production costs or lost revenues are not unrecovered costs authorized for recovery under PURA § 39.452(b).*

Under PURA, a utility has no guaranteed return. Instead, PURA § 36.051 requires that a utility's rates be set at a level so that the overall revenues it will receive provide it with a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service in excess of reasonable and necessary operating expenses. Existing revenue levels are not guaranteed; they are derived from reasonable and necessary costs (operating expenses, taxes, depreciation expense) plus a reasonable return on rate base (gross investment minus depreciation). As a utility's costs increase or decrease, the amount of revenue needed to earn a reasonable return on invested capital will also fluctuate.

### 1. An embedded production cost is a *potential* loss of revenue, not a cost as contemplated in PURA § 39.452(b).

ETI appeals the Commission's interpretation of unrecovered costs as

---

[40] AR, Binder 2, Item No. 119, Order at 27, Ordering Paragraphs 7 and 9.

incorrectly excluding embedded production costs. When a cost is embedded it means that the cost was taken into account when setting the utility's rates at a level sufficient to provide an opportunity to earn a reasonable return. Like other test year costs, it is derived assuming a certain number of customers and a certain load size. However, load fluctuation due to customer migration or customer behavioral changes are an inevitable part of doing business in the utility industry. There is no guarantee that once a rate is set that the billing units will remain static. When a utility complains that an embedded cost is not being recovered, the true complaint is that revenues are, in its opinion, insufficient. The embedded production costs that ETI believes should be included in the definition of unrecovered costs are generation-related charges ($6.84 per kW-Month for LIPS under Docket No. 37744's rates). One necessarily would have to calculate the product of that charge and the amount of CGS load (the portion not attributable to new customers), less any offsets, in order to know the amount of revenue associated with the embedded production costs in question.[41]

Unlike actual costs expended to implement the tariff, the embedded costs represent a potential loss in revenue. The Commission considered this distinction when determining in its Interim Order what costs the Legislature intended to be recovered under PURA § 39.452(b). After acknowledging the distinction between

---

[41] *See* AR, Binder 4, TIEC Exhibit No. 15 (Pollock Supplemental Direct) at 17.

20

costs and revenues, the Commission reasonably stated that, "[b]ased on the evidence and testimony, the Commission finds that the proper interpretation of 'costs unrecovered as a result of implementation of the CGS program tariff' is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs."[42]

Further, even without a CGS program, there is no guaranteed "recovery" of embedded costs or that once a rate is set that the billing units will remain static. ETI's argument that it was "guaranteed" recovery of its embedded production costs by the Legislature under PURA § 39.452(b) would lead to absurd results because instead of providing a means to compensate ETI for costs of implementing and administering a program it would not otherwise have offered, under ETI's interpretation, the Company would be entitled to a greater recovery than it would have been entitled to "but for" the existence of CGS. ETI's reasonable opportunity to earn a return under PURA § 36.051 would be converted to a guarantee. This goes beyond what the Legislature intended when it provided for recovery of unrecovered costs resulting from the implementation of the CGS tariff.

2. **Lost revenues associated with embedded production costs are not costs, nor does the Legislature believe them to be costs.**

In PURA, lost revenues are not subsumed within the term "costs;" they are

---

[42] AR, Binder 1, Item No. 77, Interim Order at 6 (Jun. 12, 2012).

21

instead an independent concept. When the Legislature has intended for both lost revenues and costs to be recovered from customers, the Legislature has stated so specifically. Analogous to the instant scenario where ETI, a regulated public utility is required by statute to offer a competitive generation service tariff, and also to the scenario in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n of Texas* where a regulated public utility was required to administer an energy efficiency program, the Legislature previously dealt with another type of regulated public utility and required those utilities to provide a service they did not seek to perform.[43] Under PURA Chapter 55, Subchapter C, the Legislature required incumbent local exchange companies ("ILECs") to offer Expanded Toll-Free Local Calling Areas ("ELCS"). In PURA § 55.048, the Legislature very specifically and separately allowed for recovery of lost revenues and costs through a monthly fee but placed a limit on the size of the fee and limited the fee's duration:

> *55.048* **CHARGES**.
>
> (a) The incumbent local exchange company shall recover **all costs incurred and all loss of revenue** from an expansion of a toll-free local calling area under this subchapter through a request other than a revenue requirement showing by imposing a monthly fee under Subsection (b) or (c), or both.
>
> (b) The company may impose a monthly fee against each residential and business customer in the petitioning exchange. **The fee may not exceed $3.50 a line for a residential customer and $7 a line for a business customer unless the customer's toll-free local**

---

[43] *CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.*, 354 S.W.3d 899 (Tex. App–Austin 2011, no pet.).

**calling area includes more than five exchanges. The company may impose an additional monthly fee of $1.50 for each exchange in excess of five.** This subsection applies regardless of the number of petitions required to obtain access to the exchanges. **A company may impose a fee under this subsection only until the company's next general rate case**.

(c)　The company may impose a monthly fee against each of the company's local exchange service customers in this state. This fee is in addition to the company's local exchange rates.

(d)　The company may not recover regulatory case expenses under this subchapter by imposing a surcharge on the subscribers of the petitioning exchange.

PURA, Tex. Util. Code § 55.048 (emphasis added).

In contrast, the Legislature in PURA § 39.452(b) did not mention lost revenues, only "costs unrecovered as a result of the implementation of the tariff." From PURA Chapter 55, we know that the Legislature does not consider lost revenues to be a subset of costs but rather a separate matter entirely. A cardinal principle of statutory construction is that if one thing is included specifically, it is presumed that things not mentioned are excluded unless otherwise stated.[44] Another rule of statutory construction is that if something is specified in one section (PURA § 55.048) but omitted in another (PURA § 39.452(b)), it is presumed that the Legislature did not intend for the item to be included in the latter.[45] Applying these principles of construction to PURA § 39.452(b), it is reasonable to interpret this statute to not authorize the recovery of lost revenues,

---

[44] *Laidlaw Waste Systems v. City of* Wilmer, 904 S.W.2d 656, 659 (Tex. 1995).
[45] *Id.*

or revenues associated with embedded production costs, as a subset of "costs unrecovered as a result of the implementation of the [CGS program] tariff." The Commission's Order correctly recognized that lost revenues or embedded production "costs" are not subsumed within the costs authorized for recovery under PURA § 39.452(b).

Further, this Court in *CenterPoint Energy Houston Electric* pointed to these same provisions of PURA (from Chapter 55) when finding that "lost revenues" were not contemplated for recovery under PURA § 39.905. The Court stated:

> These provisions further support our conclusion that the term "costs," as used by the legislature in PURA, is not intended to include lost revenues. The legislature's failure in PURA section 39.905 to specifically provide for recovery of "lost revenues," in addition to "costs," indicates that it intended for the EECRF to serve as a mechanism for a utility to recover out-of-pocket expenditures associated with its implementation of energy-efficiency programs, not to compensate a utility for any associated lost revenues attributable to those programs.[46]

The *CenterPoint Energy Houston Electric* opinion is consistent with other courts' opinions which have also held that, when construing a statutory word or phrase, the court may take into consideration the meaning of the same or similar language used elsewhere in the act.[47] Where the same or a similar term is used in the same

---

[46] 354 S.W.3d 899, 904 (Tex. App.–Austin 2011, no pet.).

[47] *Guthery v. Taylor*, 112 S.W.3d 715, 721-22 (Tex. App.—Houston [14th Dist.] 2003, no pet.) citing *L & M-Surco Mfg., Inc. v. Winn Tile Co.*, 580 S.W.2d 920, 926 (Tex. Civ. App.-Tyler 1979, writ dism'd).

24

connection in different statutes, it will be given the same meaning in one that it has in another, unless there is something to indicate that a different meaning was intended.[48] The Court in *CenterPoint Energy Houston Electric* looked at how the term "costs" was used throughout PURA and determined that consistent with the rest of the Act, PURA § 39.905 did not include the concept of lost revenues when using the term "costs." In turn, in the instant case, the Commission reasonably looked to PURA and the Court's opinion in *CenterPoint Energy Houston Electric* and likewise determined that "costs" under 39.452(b) did not include lost revenues or embedded production costs.[49] The District Court correctly affirmed the Commission's determination of what is meant by "costs unrecovered as a result of the implementation of the [CGS] tariff" and should be affirmed.

g.    The *High Plains* decision is not informative on the question presented.

On pages 27-28 of its Appellant's Brief, ETI discusses a per curiam opinion of the Supreme Court of Texas, *Railroad Commission v. High Plains Natural Gas Company*.[50] ETI asserts that the Court in *High Plains* was presented with a "materially identical requirement" in the Gas Utility Regulatory Act (GURA).[51] ETI's characterization is    incorrect;    the    requirements    are    substantially    different    because    the

---

[48] *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 692 (Tex. App.—Austin 2005, no pet.); *Guthery v. Taylor*, 112 S.W.3d at 721-22.
[49] AR, Binder 1, Item No. 77, Interim Order at 6 (Jun. 12, 2012).
[50] 628 S.W.2d 753 (Tex. 1981).
[51] Tex. Util. Code §§ 101.001-105.051 (West 2007 & Supp. 2014).

characteristics of the rate mechanisms are fundamentally miles apart. The *High Plains* decision involved a Purchased Gas Adjustment (PGA) which is an automatic pass-through. GURA does not have an anti-automatic pass-through provision, whereas PURA includes § 36.201 which prohibits automatic adjustments for changes in costs. The CGS statute nowhere mentions or implies any exception or exclusion to PURA § 36.201's prohibition against automatic pass-through adjustments.

Second, the Railroad Commission in the *High Plains* case had purposely set the PGA clause at 90 percent instead of 100 percent of the incremental gas cost over the base rate to provide the utility an incentive to purchase fuel at the lowest possible price. In other words, the Railroad Commission deliberately declined to allow the utility to recover all of its operating expenses it was entitled to recover. In contrast, the Public Utility Commission in the proceeding below allows ETI to recover *all* costs that are unrecovered as a result of the implementation of the CGS tariff. ETI just disagrees with the Commission's definition of what those costs are. The Commission's interpretation of the CGS statute is reasonable and is in harmony with PURA as a whole. For these reasons, the Commission's Order should be affirmed.

PRAYER

For all of these reasons, the Office of Public Utility Counsel respectfully prays that the Court deny Appellant Entergy Texas, Inc.'s First Issue Presented, and affirm the Commission's Order. OPUC further prays for any other relief to which it may be justly entitled.

Respectfully submitted,

Tonya Baer
Public Counsel
State Bar No. 24026771

/s/ *Sara J. Ferris*
Sara J. Ferris
Senior Assistant Public Counsel
State Bar No. 50511915

OFFICE OF PUBLIC UTILITY COUNSEL
1701 N. Congress Avenue, Suite 9-180
P.O. Box 12397
Austin, Texas 78711-2397
512/936-7500 (Telephone)
512/936-7525 (Facsimile)
Sara.Ferris@opuc.texas.gov

# Certificate of Service

I certify that the Appellee Brief and Appendix of the Office of Public Utility Counsel was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy of the Appellee Brief and Appendix of the Office of Public Utility Counsel was served upon counsel for each party of record, listed below, by electronic service and 1st Class U.S. Mail, on this 13th day of February, 2015.

Marnie A. McCormick
John F. Williams
Duggins, Wren, Mann & Romero, LLP
P.O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
(512) 744-9399 (fax)
mmcormick@dwmrlaw.com
jwilliams@dwmrlaw.com
*Counsel for Entergy Texas, Inc.*

Rex VanMiddlesworth
Benjamin Hallmark
Thompson & Knight, LLP
98 San Jacinto Blvd, Ste. 1900
Austin, Texas 78701
(512) 469-6100
(512) 469-6180 (fax)
rex.vanm@tklaw.com
benjamin.hallmark@tklaw.com
*Counsel for Texas Industrial Energy Consumers*

Elizabeth R. B. Sterling
Megan M. Neal
Environmental Protection Division
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4152
(512) 320-0911 (fax)
elizabeth.sterling@texasattorneygeneral.gov
megan.neal@texasattorneygeneral.gov
*Counsel for the Public Utility Commission of Texas*

_____/s/ *Sara J. Ferris*_____
Sara J. Ferris

## Certificate of Compliance

I certify that the Appellee Brief and Appendix of the Office of Public Utility Counsel contains 6,841 words, as measured by the undersigned counsel's word-processing software, and therefore complies with the word limit found in Tex. R. App. P. 9.4(i)(2)(B).


_____/s/ *Sara J. Ferris*_____
Sara J. Ferris

# Appendix to the Appellee Brief of the
# Office of Public Utility Counsel

- PURA – Select Statutes

- PUC Substantive Rule 25.234

- Excerpt from *Application of Gulf States Utilities Company for Authority to Change Rates*, Docket No. 3871, 7 P.U.C. Bull. 410 (Sep. 17, 1981)

# PURA – Select Statutes

# PUBLIC UTILITY REGULATORY ACT

Title II, Texas Utilities Code

(As Amended)

Effective as of September 1, 2013

# PUBLIC UTILITY COMMISSION
# OF TEXAS

# FOREWORD

The Public Utility Code was enacted by Acts 1997, 75th Leg., R.S., ch. 166, § 1 as a new and separate code effective September 1, 2007.  Title 2 of the code is properly cited as the Public Utility Regulatory Act.

This edition of the Public Utility Regulatory Act contains amendments adopted through the 83rd Legislature, Third Called Session.

In general, the effect of amendments has been clear and the resulting text changes were straightforward and did not require any editorial discretion.  Except as explained below, editorial discretion was exercised in reconciling multiple amendments to the same section.  In the majority of these cases, there was no irreconcilable conflict and all of the amendments could be given effect.  In some cases, an act expressly amended a provision as added or amended by another act.  In the few cases where an irreconcilable conflict was found, the act with the later date of enactment was given effect, with the other provisions italicized below.  In addition, a note explaining the conflict is provided following the section annotation.

The annotations following each section have two components.  The first annotation shows the derivation of the section, either citing to the Public Utility Regulatory Act of 1995 (V.A.C.S. Art. 1446c-0), Acts 1997, ch. 166, or showing the section as added to the code and citing the relevant act.  The second component identifies subsequent amendments, cites the amending act (and originating bill), provides a brief summary of each of the amendments, and, where appropriate, provides a reference to related provisions or material.

This publication is maintained by the Commission Advising and Docket Management Division of the Public Utility Commission of Texas.  Suggestions or corrections may be submitted to that division.

# TITLE II.  PUBLIC UTILITY REGULATORY ACT

## SUBTITLE A.  PROVISIONS APPLICABLE TO ALL UTILITIES

## CHAPTER 11. GENERAL PROVISIONS

### Sec. 11.001.  SHORT TITLE.

This title may be cited as the Public Utility Regulatory Act.

(V.A.C.S. art. 1446c-0, Sec. 1.001.)

### Sec. 11.002.  PURPOSE AND FINDINGS.

(a)  This title is enacted to protect the public interest inherent in the rates and services of public utilities.  The purpose of this title is to establish a comprehensive and adequate regulatory system for public utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities.

(b)  Public utilities traditionally are by definition monopolies in the areas they serve.  As a result, the normal forces of competition that regulate prices in a free enterprise society do not operate. Public agencies regulate utility rates, operations, and services as a substitute for competition.

(c)  Significant changes have occurred in the telecommunications and electric power industries since the Public Utility Regulatory Act was originally adopted.  Changes in technology and market structure have increased the need for minimum standards of service quality, customer service, and fair business practices to ensure high-quality service to customers and a healthy marketplace where competition is permitted by law.  It is the purpose of this title to grant the Public Utility Commission of Texas authority to make and enforce rules necessary to protect customers of telecommunications and electric services consistent with the public interest.

(V.A.C.S. art. 1446c-0, Sec. 1.002.)  (Amended by Acts 1999, 76th Leg., R.S., ch. 1579 (SB 86), § 1 (added subsec. (c).)

### Sec. 11.003.  DEFINITIONS.

In this title:

(1)   "Affected person" means:

(A)   a public utility or electric cooperative affected by an action of a regulatory authority;

(B)   a person whose utility service or rates are affected by a proceeding before a regulatory authority; or

(C)   a person who:

(i)   is a competitor of a public utility with respect to a service performed by the utility; or

(ii)   wants to enter into competition with a public utility.

(2)   "Affiliate" means:

(A)   a person who directly or indirectly owns or holds at least five percent of the voting securities of a public utility;

(B)   a person in a chain of successive ownership of at least five percent of the voting securities of a public utility;

(C)   a corporation that has at least five percent of its voting securities owned or controlled, directly or indirectly, by a public utility;

(D)    a corporation that has at least five percent of its voting securities owned or controlled, directly or indirectly, by:

(i)    a person who directly or indirectly owns or controls at least five percent of the voting securities of a public utility; or

(ii)    a person in a chain of successive ownership of at least five percent of the voting securities of a public utility;

(E)    a person who is an officer or director of a public utility or of a corporation in a chain of successive ownership of at least five percent of the voting securities of a public utility; or

(F)    a person determined to be an affiliate under Section 11.006.

(3)    "Allocation" means the division among municipalities or among municipalities and unincorporated areas of the plant, revenues, expenses, taxes, and reserves of a utility used to provide public utility service in a municipality or for a municipality and unincorporated areas.

(4)    "Commission" means the Public Utility Commission of Texas.

(5)    "Commissioner" means a member of the Public Utility Commission of Texas.

(6)    "Cooperative corporation" means:

(A)    an electric cooperative; or

(B)    a telephone cooperative corporation organized under Chapter 162 or a predecessor statute to Chapter 162 and operating under that chapter.

(7)    "Corporation" means a domestic or foreign corporation, joint-stock company, or association, and each lessee, assignee, trustee, receiver, or other successor in interest of the corporation, company, or association, that has any of the powers or privileges of a corporation not possessed by an individual or partnership.  The term does not include a municipal corporation or electric cooperative, except as expressly provided by this title.

(8)    "Counsellor" means the public utility counsel.

(9)    "Electric cooperative" means:

(A)    a corporation organized under Chapter 161 or a predecessor statute to Chapter 161 and operating under that chapter; or

(B)    a corporation organized as an electric cooperative in a state other than Texas that has obtained a certificate of authority to conduct affairs in the State of Texas.

(10)    "Facilities" means all of the plant and equipment of a public utility, and includes the tangible and intangible property, without limitation, owned, operated, leased, licensed, used, controlled, or supplied for, by, or in connection with the business of the public utility.

(11)    "Municipally owned utility" means a utility owned, operated, and controlled by a municipality or by a nonprofit corporation the directors of which are appointed by one or more municipalities.

(12)    "Office" means the Office of Public Utility Counsel.

(13)    "Order" means all or a part of a final disposition by a regulatory authority in a matter other than rulemaking, without regard to whether the disposition is affirmative or negative or injunctive or declaratory.  The term includes:

(A)    the issuance of a certificate of convenience and necessity; and

(B)    the setting of a rate.

4

(14)  "Person" includes an individual, a partnership of two or more persons having a joint or common interest, a mutual or cooperative association, and a corporation, but does not include an electric cooperative.

(15)  "Proceeding" means a hearing, investigation, inquiry, or other procedure for finding facts or making a decision under this title.  The term includes a denial of relief or dismissal of a complaint.

(16)  "Rate" includes:

(A)  any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a public utility for a service, product, or commodity described in the definition of utility in Section 31.002 or 51.002; and

(B)  a rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification.

(17)  "Ratemaking proceeding" means a proceeding in which a rate is changed.

(18)  "Regulatory authority" means either the commission or the governing body of a municipality, in accordance with the context.

(19)  "Service" has its broadest and most inclusive meaning.  The term includes any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to its patrons, employees, other public utilities, an electric cooperative, and the public.  The term also includes the interchange of facilities between two or more public utilities.  The term does not include the printing, distribution, or sale of advertising in a telephone directory.

(20)  "Test year" means the most recent 12 months, beginning on the first day of a calendar or fiscal year quarter, for which operating data for a public utility are available.

(21)  "Trade association" means a nonprofit, cooperative, and voluntarily joined association of business or professional persons who are employed by public utilities or utility competitors to assist the public utility industry, a utility competitor, or the industry's or competitor's employees in dealing with mutual business or professional problems and in promoting their common interest.

(V.A.C.S. art. 1446c-0, Secs. 1.003(1), (2) (part), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (13A), (14), (15), (16), (17), (18).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 1 (amended subds. (1)(A), (6), (7); added new subd. (9) and renumbered former subds. (9) to (20) as subds. (10) to (21); and amended renumbered subds. (14), (17), and (19)); Acts 2003, 78th Leg., R.S., ch. 1327 (SB 1280), § 1 (deleted former subd. (9)(C)).)

### Sec. 11.004.  DEFINITION OF UTILITY.

In Subtitle A, "public utility" or "utility" means:

(1)  an electric utility, as that term is defined by Section 31.002; or

(2)  a public utility or utility, as those terms are defined by Section 51.002.

(V.A.C.S. art. 1446c-0, Sec. 1.004.)

### Sec. 11.0042.  DEFINITION OF AFFILIATE.

(a)  The term "person" or "corporation" as used in the definition of "affiliate" provided by Section 11.003(2) does not include:

(1)  a broker or dealer registered under the Securities Exchange Act of 1934 (15 U.S.C. Section 78a et seq.), as amended;

(2)  a bank or insurance company as defined under the Securities Exchange Act of 1934 (15 U.S.C. Section 78a et seq.), as amended;

(3)　an investment adviser registered under state law or the Investment Advisers Act of 1940 (15 U.S.C. Section 80b-1 et seq.); or

(4)　an investment company registered under the Investment Company Act of 1940 (15 U.S.C. Section 80a-1 et seq.); or

(5)　an employee benefit plan, pension fund, endowment fund, or other similar entity that may, directly or indirectly, own, hold, or control five percent or more of the voting securities of a public utility or the parent corporation of a public utility if the entity did not acquire the voting securities:

　　(A)　for the purpose of or with the effect of changing or influencing the control of the issuer of the securities; or

　　(B)　in connection with or as a participant in any transaction that changes or influences the control of the issuer of the securities.

(b)　For the purpose of determining whether a person is an affiliate under Section 11.006(a)(3), the term "person" does not include an entity that may, directly or indirectly, own, hold, or control the voting securities of a public utility or the parent corporation of a public utility if the entity did not acquire the voting securities:

(1)　for the purpose of or with the effect of changing or influencing the control of the issuer of the securities; or

(2)　in connection with or as a participant in any transaction that changes or influences the control of the issuer of the securities.

(c)　A report filed by an entity described by Subsection (a)(5) or (b) with the Securities and Exchange Commission is conclusive evidence of the entity's intent if the report confirms that the voting securities were not acquired:

(1)　for the purpose of or with the effect of changing or influencing the control of the issuer of the securities; or

(2)　in connection with or as a participant in any transaction that changes or influences the control of the issuer of the securities.

(Added by Acts 2005, 79th Leg., R.S., ch. 413 (SB 1668), § 2.)

## Sec. 11.005.  ENTITY, COMPETITOR, OR SUPPLIER AFFECTED IN MANNER OTHER THAN BY SETTING OF RATES.

In this title, an entity, including a utility competitor or utility supplier, is considered to be affected in a manner other than by the setting of rates for that class of customer if during a relevant calendar year the entity provides fuel, utility-related goods, utility-related products, or utility-related services to a regulated or unregulated provider of telecommunications or electric services or to an affiliate in an amount equal to the greater of $10,000 or 10 percent of the person's business.

(V.A.C.S. art. 1446c-0, Sec. 1.006.)

## Sec. 11.006.  PERSON DETERMINED TO BE AFFILIATE.

(a)　The commission may determine that a person is an affiliate for purposes of this title if the commission after notice and hearing finds that the person:

(1)　actually exercises substantial influence or control over the policies and actions of a public utility;

(2)　is a person over which a public utility exercises the control described by Subdivision (1);

(3)　is under common control with a public utility; or

(4)   together with one or more persons with whom the person is related by ownership or blood relationship, or by action in concert, actually exercises substantial influence over the policies and actions of a public utility even though neither person may qualify as an affiliate individually.

(b)  For purposes of Subsection (a)(3), "common control with a public utility" means the direct or indirect possession of the power to direct or cause the direction of the management and policies of another, without regard to whether that power is established through ownership or voting of securities or by any other direct or indirect means.

(V.A.C.S. art. 1446c-0, Sec. 1.003(2) (part).)

### Sec. 11.007.  ADMINISTRATIVE PROCEDURE.

(a)  Chapter 2001, Government Code, applies to a proceeding under this title except to the extent inconsistent with this title.

(b)  A communication of a member or employee of the commission with any person, including a party or a party's representative, is governed by Section 2001.061, Government Code.

(V.A.C.S. art. 1446c-0, Sec. 1.005(a).)

### Sec. 11.008.  LIBERAL CONSTRUCTION.

This title shall be construed liberally to promote the effectiveness and efficiency of regulation of public utilities to the extent that this construction preserves the validity of this title and its provisions.

(V.A.C.S. art. 1446c-0, Sec. 1.404 (part).)

### Sec. 11.009.  CONSTRUCTION WITH FEDERAL AUTHORITY.

This title shall be construed to apply so as not to conflict with any authority of the United States.

(V.A.C.S. art. 1446c-0, Sec. 1.404 (part).)

# CHAPTER 36.  RATES

## SUBCHAPTER A.  GENERAL PROVISIONS

### Sec. 36.001.  AUTHORIZATION TO ESTABLISH AND REGULATE RATES.

(a)  The regulatory authority may establish and regulate rates of an electric utility and may adopt rules for determining:

(1)   the classification of customers and services; and

(2)   the applicability of rates.

(b)   A rule or order of the regulatory authority may not conflict with a ruling of a federal regulatory body.

(V.A.C.S. art. 1446c-0, Sec. 2.201.)

### Sec. 36.002.  COMPLIANCE WITH TITLE.

An electric utility may not charge or receive a rate for utility service except as provided by this title.

(V.A.C.S. art. 1446c-0, Sec. 2.153 (part).)

### Sec. 36.003.  JUST AND REASONABLE RATES.

(a)   The regulatory authority shall ensure that each rate an electric utility or two or more electric utilities jointly make, demand, or receive is just and reasonable.

(b)   A rate may not be unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable, and consistent in application to each class of consumer.

(c)   An electric utility may not:

(1)   grant an unreasonable preference or advantage concerning rates to a person in a classification;

(2)   subject a person in a classification to an unreasonable prejudice or disadvantage concerning rates; or

(3)   establish or maintain an unreasonable difference concerning rates between localities or between classes of service.

(d)   In establishing an electric utility's rates, the commission may treat as a single class two or more municipalities that an electric utility serves if the commission considers that treatment to be appropriate.

(e)   A charge to an individual customer for retail or wholesale electric service that is less than the rate approved by the regulatory authority does not constitute an impermissible difference, preference, or advantage.

(V.A.C.S. art. 1446c-0, Secs. 2.202, 2.214 (part).)

### Sec. 36.004.  EQUALITY OF RATES AND SERVICES.

(a)   An electric utility may not directly or indirectly charge, demand, or receive from a person a greater or lesser compensation for a service provided or to be provided by the utility than the compensation prescribed by the applicable tariff filed under Section 32.101.

(b)  A person may not knowingly receive or accept a service from an electric utility for a compensation greater or less than the compensation prescribed by the tariff.

(c)   Notwithstanding Subsections (a) and (b), an electric utility may charge an individual customer for wholesale or retail electric service in accordance with Section 36.007.

(d)  This title does not prevent a cooperative corporation from returning to its members net earnings resulting from its operations in proportion to the members' purchases from or through the corporation.

(V.A.C.S. art. 1446c-0, Secs. 2.215(a), (b).)

## Sec. 36.005.  RATES FOR AREA NOT IN MUNICIPALITY.

Without the approval of the commission, an electric utility's rates for an area not in a municipality may not exceed 115 percent of the average of all rates for similar services for all municipalities served by the same utility in the same county as that area.

(V.A.C.S. art. 1446c-0, Sec. 2.213.)

## Sec. 36.006.  BURDEN OF PROOF.

In a proceeding involving a proposed rate change, the electric utility has the burden of proving that:

(1)  the rate change is just and reasonable, if the utility proposes the change; or

(2)  an existing rate is just and reasonable, if the proposal is to reduce the rate.

(V.A.C.S. art. 1446c-0, Sec. 2.204.)

## Sec. 36.007.  DISCOUNTED WHOLESALE OR RETAIL RATES.

(a)  On application by an electric utility, a regulatory authority may approve wholesale or retail tariffs or contracts containing charges that are less than rates approved by the regulatory authority but not less than the utility's marginal cost.  The charges must be in accordance with the principles of this title and may not be unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive.

(b)  The method for computing the marginal cost of the electric utility consists of energy and capacity components.  The energy component includes variable operation and maintenance expense and marginal fuel or the energy component of purchased power.  The capacity component is based on the annual economic value of deferring, accelerating, or avoiding the next increment of needed capacity, without regard to whether the capacity is purchased or built.

(c)  The commission shall ensure that the method for determining marginal cost is consistently applied among utilities but may recognize the individual load and resource requirements of the electric utility.

(d)  Notwithstanding any other provision of this title, the commission shall ensure that the electric utility's allocable costs of serving customers paying discounted rates under this section are not borne by the utility's other customers.

(V.A.C.S. art. 1446c-0, Secs. 2.001(b), (c), (d) (part), 2.052(b), (c).)

## Sec. 36.008.  STATE TRANSMISSION SYSTEM.

In establishing rates for an electric utility, the commission may review the state's transmission system and make recommendations to the utility on the need to build new power lines, upgrade power lines, and make other necessary improvements and additions.

(V.A.C.S. art. 1446c-0, Sec. 2.051(w) (part).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 23.)

## Sec. 36.009.  BILLING DEMAND FOR CERTAIN UTILITY CUSTOMERS.

Notwithstanding any other provision of this code, the commission by rule shall require a transmission and distribution utility to:

(1)  waive the application of demand ratchet provisions for each nonresidential secondary service customer that has a maximum load factor equal to or below a factor set by commission rule;

(2)  implement procedures to verify annually whether each nonresidential secondary service customer has a maximum load factor that qualifies the customer for the waiver described by Subdivision (1);

(3)    specify in the utility's tariff whether the utility's nonresidential secondary service customers that qualify for the waiver described by Subdivision (1) are to be billed for distribution service charges on the basis of:

(A)    kilowatts;

(B)    kilowatt-hours; or

(C)    kilovolt-amperes; and

(4)    modify the utility's tariff in the utility's next base rate case to implement the waiver described by Subdivision (1) and make the specification required by Subdivision (3).

(Added by Acts 2011, 82nd Leg., R.S., ch. 150 (HB 1064), § 1.)

## SUBCHAPTER B.  COMPUTATION OF RATES

### Sec. 36.051.  ESTABLISHING OVERALL REVENUES.

In establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.

(V.A.C.S. art. 1446c-0, Sec. 2.203(a).)

### Sec. 36.052.  ESTABLISHING REASONABLE RETURN.

In establishing a reasonable return on invested capital, the regulatory authority shall consider applicable factors, including:

(1)    the efforts and achievements of the utility in conserving resources;

(2)    the quality of the utility's services;

(3)    the efficiency of the utility's operations; and

(4)    the quality of the utility's management.

(V.A.C.S. art. 1446c-0, Sec. 2.203(b).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 24 (repealed former subd. (1) and renumbered former subds. (2) to (5) as subds. (1) to (4)).)

### Sec. 36.053.  COMPONENTS OF INVESTED CAPITAL.

(a)    Electric utility rates shall be based on the original cost, less depreciation, of property used by and useful to the utility in providing service.

(b)    The original cost of property shall be determined at the time the property is dedicated to public use, whether by the utility that is the present owner or by a predecessor.

(c)    In this section, the term "original cost" means the actual money cost or the actual money value of consideration paid other than money.

(d)    If the commission issues a certificate of convenience and necessity or, acting under Section 39.203(e), orders an electric utility or a transmission and distribution utility to construct or enlarge transmission or transmission-related facilities to facilitate meeting the goal for generating capacity from renewable energy technologies under Section 39.904(a), the commission shall find that the facilities are used and useful to the utility in providing service for purposes of this section and are prudent and includable in the rate base, regardless of the extent of the utility's actual use of the facilities.

(V.A.C.S. art. 1446c-0, Secs. 2.206(a) (part), (c).)  (Amended by Acts 2005, 79th Leg., 1st C.S., ch. 1 (SB 20), § 1 (added subsec. (d)).)

(A)   the amount by which the money collected under the temporary rates is less than the money that would have been collected under the rate finally ordered; and

(B)   interest on that amount, at the current interest rate as determined by the commission.

(V.A.C.S. art. 1446c-0, Sec. 2.211(d).)

### Sec. 36.156.  AUTOMATIC TEMPORARY RATES.

(a)   The rates charged by the electric utility on the 185th day after the date the utility files the rate-filing package required by Section 36.153 automatically become temporary rates if:

(1)   the 185-day period has been extended under Section 36.154(b); and

(2)   the regulatory authority has not issued a final order or established temporary rates for the electric utility on or before the 185th day.

(b)   On issuance of a final order, the regulatory authority:

(1)   shall require the electric utility to refund to customers or to credit against future bills:

(A)   money collected under the temporary rates in excess of the rate finally ordered; and

(B)   interest on that money, at the current interest rate as determined by the commission; or

(2)   shall authorize the electric utility to surcharge bills to recover:

(A)   the amount by which the money collected under the temporary rates is less than the money that would have been collected under the rate finally ordered; and

(B)   interest on that amount, at the current interest rate as determined by the commission.

(V.A.C.S. art. 1446c-0, Sec. 2.211(e).)

## SUBCHAPTER E.  COST RECOVERY AND RATE ADJUSTMENT

### Sec. 36.201.  AUTOMATIC ADJUSTMENT FOR CHANGES IN COSTS.

Except as permitted by Section 36.204, the commission may not establish a rate or tariff that authorizes an electric utility to automatically adjust and pass through to the utility's customers a change in the utility's fuel or other costs.

(V.A.C.S. art. 1446c-0, Sec. 2.212(g)(1).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 26.)

### Sec. 36.202.  ADJUSTMENT FOR CHANGE IN TAX LIABILITY.

(a)   The commission, on its own motion or on the petition of an electric utility, shall provide for the adjustment of the utility's billing to reflect an increase or decrease in the utility's tax liability to this state if the increase or decrease:

(1)   results from Chapter 5, Acts of the 72nd Legislature, 1st Called Session, 1991; and

(2)   is attributable to an activity subject to the commission's jurisdiction.

(b)   The commission shall apportion pro rata to each type and class of service provided by the utility any billing adjustment under this section.  The adjustment:

(1)   shall be made effective at the same time as the increase or decrease of tax liability described by Subsection (a)(1) or as soon after that increase or decrease as is reasonably practical; and

(2)   remains effective only until the commission alters the adjustment as provided by this section or enters an order for the utility under Subchapter C or D.

(c)   Each year after an original adjustment, the commission shall:

(1)   review the utility's increase or decrease of tax liability described by Subsection (a)(1); and

(2)   alter the adjustment as necessary to reflect the increase or decrease.

(d)   A proceeding under this section is not a rate case under Subchapter C.

(V.A.C.S. art. 1446c-0, Sec. 2.212(h).)

## Sec. 36.203.  FUEL COST RECOVERY; ADJUSTMENT OF FUEL FACTOR.

(a)   Section 36.201 does not prohibit the commission from reviewing and providing for adjustments of a utility's fuel factor.

(b)   The commission by rule shall implement procedures that provide for the timely adjustment of a utility's fuel factor, with or without a hearing.  The procedures must require that:

(1)   the findings required by Section 36.058 regarding fuel transactions with affiliated interests are made in a fuel reconciliation proceeding or in a rate case filed under Subchapter C or D; and

(2)   an affected party receive notice and have the opportunity to request a hearing before the commission.

(c)   The commission may adjust a utility's fuel factor without a hearing if the commission determines that a hearing is not necessary.  If the commission holds a hearing, the commission may consider at the hearing any evidence that is appropriate and in the public interest.

(d)   The commission shall render a timely decision approving, disapproving, or modifying the adjustment to the utility's fuel factor.

(e)   The commission by rule shall provide for the reconciliation of a utility's fuel costs on a timely basis.

(f)   A proceeding under this section is not a rate case under Subchapter C.

(V.A.C.S. art. 1446c-0, Sec. 2.212(g)(2).)

## Sec. 36.204.  COST RECOVERY AND INCENTIVES.

In establishing rates for an electric utility, the commission may:

(1)   allow timely recovery of the reasonable costs of conservation, load management, and purchased power, notwithstanding Section 36.201; and

(2)   authorize additional incentives for conservation, load management, purchased power, and renewable resources.

(V.A.C.S. art. 1446c-0, Sec. 2.051(w) (part).)  (Amended by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 27.)

## Sec. 36.205.  PURCHASED POWER COST RECOVERY.

(a)   This section applies only to an increase or decrease in the cost of purchased electricity that has been:

(1)   accepted by a federal regulatory authority; or

(2)   approved after a hearing by the commission.

(b)   The commission may use any appropriate method to provide for the adjustment of the cost of purchased electricity on terms determined by the commission.

(c)   Purchased electricity costs may be recovered:

(1)   concurrently with the effective date of the changed costs to the purchasing electric utility; or

(2)   as soon after the effective date as reasonably practical.

(d)   The commission may provide a mechanism to allow an electric utility that has a noncontiguous geographical service area and that purchases power for resale for that noncontiguous service area from electric utilities that are not members of the Electric Reliability Council of Texas to recover purchased

of the approved transition to competition costs. A rate rider implemented to recover approved transition to competition costs shall expire not later than December 31, 2006.

(Added by Acts 2001, 77th Leg., R.S., ch. 1041 (HB 1692), § 2.)

### Sec. 39.410.  CONTRACTUAL OBLIGATIONS.

This subchapter may not:

(1)  interfere with or abrogate the rights or obligations of any party, including a retail or wholesale customer, to a contract with an investor-owned electric utility, river authority, municipally owned utility, or electric cooperative;

(2)  interfere with or abrogate the rights or obligations of a party under a contract or agreement concerning certificated utility service areas; or

(3)  result in a change in wholesale power costs to wholesale customers in Texas purchasing electricity under wholesale power contracts the pricing provisions of which are based on formulary rates, fuel adjustments, or average system costs.

(Added by Acts 2001, 77th Leg., R.S., ch. 1041 (HB 1692), § 2.)

## SUBCHAPTER J.  TRANSITION TO COMPETITION IN CERTAIN NON-ERCOT AREAS

### Sec. 39.451.  APPLICABILITY.

This subchapter applies only to an investor-owned electric utility  that is operating solely outside of ERCOT in areas of this state that were included in the Southeastern Electric Reliability Council on January 1, 2005.

(Added by Acts 2005, 79th Leg., R.S., ch. 1072 (HB 1567), § 1.)

### Sec. 39.452.  REGULATION OF UTILITY AND TRANSITION TO COMPETITION.

(a)  Until the date on which an electric utility subject to this subchapter is authorized by the commission to implement customer choice under Section 39.453, the rates of the electric utility shall be regulated under traditional cost-of-service regulation and the electric utility is subject to all applicable regulatory authority prescribed by this subtitle and Subtitle A, including Chapters 14, 32, 33, 36, and 37.

(b)  An electric utility subject to this subchapter shall propose a competitive generation tariff to allow eligible customers the ability to contract for competitive generation.  The commission shall approve, reject, or modify the proposed tariff not later than September 1, 2010.  The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007, and the utility's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff.  The commission shall ensure that a competitive generation tariff shall not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation.  Pursuant to the competitive generation tariff, an electric utility subject to this subsection shall purchase competitive generation service, selected by the customer, and provide the generation at retail to the customer.  An electric utility subject to this subsection shall provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service.  Such customers shall not be considered wholesale transmission customers.  Notwithstanding any other provision of this chapter, the commission may not issue a decision relating to a competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

(c)  That portion of any commission order issued before the effective date of this section requiring the electric utility to comply with a provision of this chapter is void.

(d)   Until the date on which an electric utility subject to this subchapter implements customer choice:

(1)   the provisions of this chapter do not apply to that electric utility, other than this subchapter, Sections 39.904 and 39.905, the provisions relating to the duty to obtain a permit from the Texas Commission on Environmental Quality for an electric generating facility and to reduce emissions from an electric generating facility, and the provisions of Subchapter G that pertain to the recovery and securitization of hurricane reconstruction costs authorized by Sections 39.458-39.463; and

(2)   the electric utility is not subject to a rate freeze and, subject to the limitation provided by Subsection (b), may file for rate changes under Chapter 36 and for approval of one or more of the rate rider mechanisms authorized by Sections 39.454 and 39.455.

(e)   An electric utility subject to this subchapter may proceed with and complete jurisdictional separation to establish two vertically integrated utilities, one of which is solely subject to the retail jurisdiction of the commission and one of which is solely subject to the retail jurisdiction of the Louisiana Public Service Commission.

(f)   Not later than January 1, 2006, an electric utility subject to this subchapter shall file a plan with the commission for identifying the applicable power region or power regions, enumerating the steps to achieve the certification of a power region in accordance with Section 39.453, and specifying the schedule for achieving the certification of a power region. The utility may amend the plan as appropriate. The commission may, on its own motion or the motion of any affected person, initiate a proceeding to certify a qualified power region under Section 39.152 when the conditions supporting such a proceeding exist.

(g)   Not later than the earlier of January 1, 2007, or the 90th day after the date the applicable power region is certified in accordance with Section 39.453, the electric utility shall file a transition to competition plan. The transition to competition plan must:

(1)   identify how the electric utility intends to mitigate market power and to achieve full customer choice, including specific alternatives for constructing additional transmission facilities, auctioning rights to generation capacity, divesting generation capacity, or any other measure that is consistent with the public interest;

(2)   include a provision to reinstate a customer choice pilot project and to establish a price to beat for residential customers and commercial customers having a peak load of 1,000 kilowatts or less; and

(3)   include any other additional information or provisions that the commission may require.

(h)   The commission shall approve, modify, or reject a plan filed under Subsection (g) not later than the 180th day after the date the plan is filed unless a hearing is requested by any party to the proceeding. A modification to the plan by the commission may not be in conflict with the jurisdiction or orders of the Federal Energy Regulatory Commission or result in significant additional cost without allowing for timely recovery for that cost.  If a hearing is requested, the 180-day deadline is extended one day for each day of the hearing.  The transition to competition plan shall be updated or amended annually, subject to commission approval, until the initiation of customer choice by an electric utility subject to this subchapter.  Consistent with its jurisdiction, the commission shall have the authority in approving or modifying the transition to competition plan to require the electric utility to take reasonable steps to facilitate the development of a wholesale generation market within the boundaries of the electric utility's service territory.

(i)   Notwithstanding any other provision of this chapter, if the commission has not approved the transition to competition plan under this section before January 1, 2009, an electric utility subject to this subchapter shall cease all activities relating to the transition to competition under this section.  The commission may, on its own motion or the motion of any affected person, initiate a proceeding under Section 39.152 to certify a power region to which the utility belongs as a qualified power region when the conditions supporting such a proceeding exist.  The commission may not approve a plan under Subsection (g) until the expiration of four years from the time that the commission certifies a power

region under Subsection (f). If after the expiration of four years from the time the commission certifies a power region under Subsection (f), and after notice and a hearing, the commission determines consistent with the study required by Section 5, S.B. No. 1492, Acts of the 81st Legislature, Regular Session, 2009, that the electric utility cannot comply with Section 38.073, it shall consider approving a plan under Subsection (g).

(j)  Notwithstanding any other provision of this subtitle, in awarding a certificate of convenience and necessity or allowing cost recovery for purchased power by an electric utility subject to this section, the commission shall ensure in its determination that the provisions of Sections 37.056(c)(4)(D) and (E) are met and that the generating facility or the purchased power agreement satisfies the identified reliability needs of the utility.

(Added by Acts 2005, 79th Leg., R.S., ch. 1072 (HB 1567), § 1.)  (Amended by Acts 2006, 79th Leg., 3rd C.S., ch. 11 (HB 163), § 1 (amended subd. (a) & (d)(1); Acts 2009, 81st Leg., R.S., ch. 1226 (SB 1492), § 3 (amended subsec. (b) and added subsecs. (i) and (j)).)

## Sec. 39.4525.  HIRING ASSISTANCE FOR FEDERAL PROCEEDINGS.

(a)  The commission may retain any consultant, accountant, auditor, engineer, or attorney the commission considers necessary to represent the commission in a proceeding before the Federal Energy Regulatory Commission, or before a court reviewing proceedings of that federal commission, related to:

(1)   the relationship of an electric utility subject to this subchapter to a power region, regional transmission organization, or independent system operator; or

(2)   the approval of an agreement among the electric utility and the electric utility's affiliates concerning the coordination of the operations of the electric utility and the electric utility's affiliates.

(b)  Assistance for which a consultant, accountant, auditor, engineer, or attorney may be retained under Subsection (a) may include:

(1)   conducting a study;

(2)   conducting an investigation;

(3)   presenting evidence;

(4)   advising the commission; or

(5)   representing the commission.

(c)   The electric utility shall pay timely the reasonable costs of the services of a person retained under Subsection (a), as determined by the commission.  The total costs an electric utility is required to pay under this subsection may not exceed $1.5 million in a 12-month period.

(d)  The commission shall allow the electric utility to recover both the total costs the electric utility paid under Subsection (c) and the carrying charges for those costs through a rider established annually to recover the costs paid and carrying charges incurred during the preceding calendar year.  The rider may not be implemented before the rider is reviewed and approved by the commission.

(e)  The commission shall consult the attorney general before the commission retains a consultant, accountant, auditor, or engineer under Subsection (a).  The retention of an attorney under Subsection (a) is subject to the approval of the attorney general under Section 402.0212, Government Code.

(f)  The commission shall be precluded from engaging any individual who is required to register under Section 305.003, Government Code.

(g)  This section expires December 31, 2017.

(Added by Acts 2011, 82nd Leg., R.S., ch. 100 (SB 980), § 1.)

## Sec. 39.9044.  GOAL FOR NATURAL GAS.

(a)   It is the intent of the legislature that 50 percent of the megawatts of generating capacity installed in this state after January 1, 2000, use natural gas.  To the extent permitted by law, the commission shall establish a program to encourage utilities to comply with this section by using natural gas produced in this state as the preferential fuel.  This section does not apply to generating capacity for renewable energy technologies.

(b)  The commission shall establish a natural gas energy credits trading program.  Any power generation company, municipally owned utility, or electric cooperative that does not satisfy the requirements of Subsection (a) by directly owning or purchasing capacity using natural gas technologies shall purchase sufficient natural gas energy credits to satisfy the requirements by holding natural gas energy credits in lieu of capacity from natural gas energy technologies.

(c)   Not later than January 1, 2000, the commission shall adopt rules necessary to administer and enforce this section and to perform any necessary studies in cooperation with the Railroad Commission of Texas.  At a minimum, the rules shall:

(1)    establish the minimum annual natural gas generation requirement for each power generation company, municipally owned utility, and electric cooperative operating in this state in a manner reasonably calculated by the commission to produce, on a statewide basis, compliance with the requirement prescribed by Subsection (a); and

(2)    specify reasonable performance standards that all natural gas capacity additions must meet to count against the requirement prescribed by Subsection (a) and that:

(A)    are designed and operated so as to maximize the energy output from the capacity additions in accordance with then-current industry standards and best industry standards; and

(B)    encourage the development, construction, and operation of new natural gas energy projects at those sites in this state that have the greatest economic potential for capture and development of this state's environmentally beneficial natural gas resources.

(d)   The commission, with the assistance of the Railroad Commission of Texas, shall adopt rules allowing and encouraging retail electric providers and municipally owned utilities and electric cooperatives that have adopted customer choice to market electricity generated using natural gas produced in this state as environmentally beneficial.  The rules shall allow a provider, municipally owned utility, or cooperative to:

(1)    emphasize that natural gas produced in this state is the cleanest-burning fossil fuel; and

(2)    label the electricity generated using natural gas produced in this state as "green" electricity.

(e)   In this section, "natural gas technology" means any technology that exclusively relies on natural gas as a primary fuel source.

(Added by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 39.)

## Sec. 39.9048.  NATURAL GAS FUEL.

It is the intent of the legislature that:

(1)    the cost of generating electricity remain as low as possible; and

(2)    the state establish and publicize a program to keep the costs of fuel, such as natural gas, used for generating electricity low.

(Added by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 39.)

## Sec. 39.905.  GOAL FOR ENERGY EFFICIENCY.

(a)   It is the goal of the legislature that:

(1) electric utilities will administer energy efficiency incentive programs in a market-neutral, nondiscriminatory manner but will not offer underlying competitive services;

(2) all customers, in all customer classes, will have a choice of and access to energy efficiency alternatives and other choices from the market that allow each customer to reduce energy consumption, summer and winter peak demand, or energy costs;

(3) each electric utility annually will provide, through market-based standard offer programs or through targeted market-transformation programs, incentives sufficient for retail electric providers and competitive energy service providers to acquire additional cost-effective energy efficiency, subject to cost ceilings established by the commission, for the utility's residential and commercial customers equivalent to:

(A) not less than:

(i) 30 percent of the electric utility's annual growth in demand of residential and commercial customers by December 31 of each year beginning with the 2013 calendar year; and

(ii) the amount of energy efficiency to be acquired for the utility's residential and commercial customers for the most recent preceding year; and

(B) for an electric utility whose amount of energy efficiency to be acquired under this subsection is equivalent to at least four-tenths of one percent of the electric utility's summer weather-adjusted peak demand for residential and commercial customers in the previous calendar year, not less than:

(i) four-tenths of one percent of the utility's summer weather-adjusted peak demand for residential and commercial customers by December 31 of each subsequent year; and

(ii) the amount of energy efficiency to be acquired for the utility's residential and commercial customers for the most recent preceding year;

(4) each electric utility in the ERCOT region shall use its best efforts to encourage and facilitate the involvement of the region's retail electric providers in the delivery of efficiency programs and demand response programs under this section, including programs for demand-side renewable energy systems that:

(A) use distributed renewable generation, as defined by Section 39.916; or

(B) reduce the need for energy consumption by using a renewable energy technology, a geothermal heat pump, a solar water heater, or another natural mechanism of the environment;

(5) retail electric providers in the ERCOT region, and electric utilities outside of the ERCOT region, shall provide customers with energy efficiency educational materials; and

(6) notwithstanding Subsection (a)(3), electric utilities shall continue to make available, at 2007 funding and participation levels, any load management standard offer programs developed for industrial customers and implemented prior to May 1, 2007.

(b) The commission shall provide oversight and adopt rules and procedures to ensure that the utilities can achieve the goal of this section, including:

(1) establishing an energy efficiency cost recovery factor for ensuring timely and reasonable cost recovery for utility expenditures made to satisfy the goal of this section;

(2) establishing an incentive under Section 36.204 to reward utilities administering programs under this section that exceed the minimum goals established by this section;

(3) providing a utility that is unable to establish an energy efficiency cost recovery factor in a timely manner due to a rate freeze with a mechanism to enable the utility to:

(A)    defer the costs of complying with this section; and

(B)    recover the deferred costs through an energy efficiency cost recovery factor on the expiration of the rate freeze period;

(4)    ensuring that the costs associated with programs provided under this section and any shareholder bonus awarded are borne by the customer classes that receive the services under the programs;

(5)    ensuring the program rules encourage the value of the incentives to be passed on to the end-use customer;

(6)    ensuring that programs are evaluated, measured, and verified using a framework established by the commission that promotes effective program design and consistent and streamlined reporting; and

(7)    ensuring that an independent organization certified under Section 39.151 allows load participation in all energy markets for residential, commercial, and industrial customer classes, either directly or through aggregators of retail customers, to the extent that load participation by each of those customer classes complies with reasonable requirements adopted by the organization relating to the reliability and adequacy of the regional electric network and in a manner that will increase market efficiency, competition, and customer benefits.

(b-1)  The energy efficiency cost recovery factor under Subsection (b)(1) may not result in an over-recovery of costs but may be adjusted each year to change rates to enable utilities to match revenues against energy efficiency costs and any incentives to which they are granted. The factor shall be adjusted to reflect any over-collection or under-collection of energy efficiency cost recovery revenues in previous years.

(b-2)  [REPEALED]

(b-3)  Beginning not later than January 1, 2008, the commission, in consultation with the State Energy Conservation Office, annually for a period of five years shall compute and report to ERCOT the projected energy savings and demand impacts for each entity in the ERCOT region that administers standard offer programs, market transformation programs, combined heating and power technology, demand response programs, solar incentive programs, appliance efficiency standards, energy efficiency programs in public buildings, and any other relevant programs that are reasonably anticipated to reduce electricity energy or peak demand or that serve as substitutes for electric supply.

(b-4)  The commission and ERCOT shall develop a method to account for the projected efficiency impacts under Subsection (b-3) in ERCOT's annual forecasts of future capacity, demand, and reserves.

(c)    A standard offer program provided under Subsection (a)(3) must be neutral with respect to technologies, equipment, and fuels, including thermal, chemical, mechanical, and electrical energy storage technologies.

(d)    The commission shall establish a procedure for reviewing and evaluating market-transformation program options described by this subsection and other options. In evaluating program options, the commission may consider the ability of a program option to reduce costs to customers through reduced demand, energy savings, and relief of congestion.  Utilities may choose to implement any program option approved by the commission after its evaluation in order to satisfy the goal in Subsection (a), including :

(1)    energy-smart schools;

(2)    appliance retirement and recycling;

(3)    air conditioning system tune-ups;

(4)    the installation of variable speed air conditioning systems, motors, and drives;

(5)    the use of trees or other landscaping for energy efficiency;

190

(6)   customer energy management and demand response programs;

(7)   high performance residential and commercial buildings that will achieve the levels of energy efficiency sufficient to qualify those buildings for federal tax incentives;

(8)   commissioning services for commercial and institutional buildings that result in operational and maintenance practices that reduce the buildings' energy consumption;

(9)   programs for customers who rent or lease their residence or commercial space;

(10)   programs providing energy monitoring equipment to customers that enable a customer to better understand the amount, price, and time of the customer's energy use;

(11)   energy audit programs for owners and other residents of single-family or multifamily residences and for small commercial customers;

(12)   net-zero energy new home programs;

(13)   solar thermal or solar electric programs;

(14)   programs for using windows and other glazing systems, glass doors, and skylights in residential and commercial buildings that reduce solar gain by at least 30 percent from the level established for the federal Energy Star windows program;

(15)   data center efficiency programs; and

(16)   energy use programs with measurable and verifiable results that reduce energy consumption through behavioral changes that lead to efficient use patterns and practices.

(e)   An electric utility may use money approved by the commission for energy efficiency programs to perform necessary energy efficiency research and development to foster continuous improvement and innovation in the application of energy efficiency technology and energy efficiency program design and implementation.  Money the utility uses under this subsection may not exceed 10 percent of the greater of:

(1)   the amount the commission approved for energy efficiency programs in the utility's most recent full rate proceeding; or

(2)   the commission-approved expenditures by the utility for energy efficiency in the previous year.

(f)   Unless funding is provided under Section 39.903, each unbundled transmission and distribution utility shall include in its energy efficiency plan a targeted low-income energy efficiency program as described by Section 39.903(f)(2), and the savings achieved by the program shall count toward the transmission and distribution utility's energy efficiency goal.  The commission shall determine the appropriate level of funding to be allocated to both targeted and standard offer low-income energy efficiency programs in each unbundled transmission and distribution utility service area.  The level of funding for low-income energy efficiency programs shall be provided from money approved by the commission for the transmission and distribution utility's energy efficiency programs.  The commission shall ensure that annual expenditures for the targeted low-income energy efficiency programs of each unbundled transmission and distribution utility are not less than 10 percent of the transmission and distribution utility's energy efficiency budget for the year.  A targeted low-income energy efficiency program must comply with the same audit requirements that apply to federal weatherization subrecipients.  In an energy efficiency cost recovery factor proceeding related to expenditures under this subsection, the commission shall make findings of fact regarding whether the utility meets requirements imposed under this subsection.  The state agency that administers the federal weatherization assistance program shall participate in energy efficiency cost recovery factor proceedings related to expenditures under this subsection to ensure that targeted low-income weatherization programs are consistent with federal weatherization programs and adequately funded.

(g) The commission may provide for a good cause exemption to a utility's liability for an administrative penalty or other sanction if the utility fails to meet a goal for energy efficiency under this section and the utility's failure to meet the goal is caused by one or more factors outside of the utility's control, including:

(1) insufficient demand by retail electric providers and competitive energy service providers for program incentive funds made available by the utility through its programs;

(2) changes in building energy codes; and

(3) changes in government-imposed appliance or equipment efficiency standards.

(h) For an electric utility operating in an area not open to competition, the utility may achieve the goal of this section by:

(1) providing rebate or incentive funds directly to customers to promote or facilitate the success of programs implemented under this section; or

(2) developing, subject to commission approval, new programs other than standard offer programs and market transformation programs, to the extent that the new programs satisfy the same cost-effectiveness requirements as standard offer programs and market transformation programs.

(i) For an electric utility operating in an area open to competition, on demonstration to the commission, after a contested case hearing, that the requirements under Subsection (a) cannot be met in a rural area through retail electric providers or competitive energy service providers, the utility may achieve the goal of this section by providing rebate or incentive funds directly to customers in the rural area to promote or facilitate the success of programs implemented under this section.

(j) An electric utility may use energy audit programs to achieve the goal of this section if:

(1) the programs do not constitute more than three percent of total program costs under this section; and

(2) the addition of the programs does not cause a utility's portfolio of programs to no longer be cost-effective.

(k) To help a residential or nongovernmental nonprofit customer make informed decisions regarding energy efficiency, the commission may consider program designs that ensure, to the extent practicable, the customer is provided with information using standardized forms and terms that allow the customer to compare offers for varying degrees of energy efficiency attainable using a measure the customer is considering by cost, estimated energy savings, and payback periods.

(Added by Acts 1999, 76th Leg., R.S., ch. 405 (SB 7), § 39.) (Amended by Acts 2005, 79th Leg., R.S., ch. 328 (SB 712) § 1 (amended subsecs. (a)(2) and (b) and added subsecs. (c) to (f)); Acts 2007, 80th Leg., R.S., ch. 939 (HB 3693), § 22 (amended subsecs. (a), (b), (d), (e), and (f) and added subsecs. ((b-1) to (b-4) and (g)); Acts 2011, 82nd Leg., R.S., ch. 180 (SB 980), § 1 (amended subsecs. (a), (b), and (d) and added subsecs. (h), (i), (j), and (k), § 3 (repealed subsec. (b-2)); Acts 2011, 82nd Leg., R.S., ch. 1346 (SB 1434), § 1 (amended subsec. (f)); Acts 2013, 83rd Leg., R.S., ch. 1079 (HB 3361), § 4.01 (amended subsec. (f)).)

## Sec. 39.9051. ENERGY EFFICIENCY FOR MUNICIPALLY OWNED UTILITIES.

(a) In this section, "municipally owned utility" has the meaning assigned by Section 11.003.

(b) This section applies only to a municipally owned utility that had retail sales of more than 500,000 megawatt hours in 2005.

(c) It is the goal of the legislature that:

(1) municipally owned utilities will administer energy savings incentive programs;

(2) customers of a municipally owned utility will have a choice of and access to energy efficiency alternatives that allow customers to reduce energy consumption, peak demand, or energy costs; and

# CHAPTER 55.  REGULATION OF TELECOMMUNICATIONS SERVICES

## SUBCHAPTER A.  GENERAL PROVISIONS

### Sec. 55.001.  GENERAL STANDARD.

A public utility shall furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable.

(V.A.C.S. art. 1446c-0, Sec. 3.155(a).)

### Sec. 55.002.  COMMISSION AUTHORITY CONCERNING STANDARDS.

The commission, on its own motion or on complaint and after reasonable notice and hearing, may:

(1)   adopt just and reasonable standards, classifications, rules, or practices a public utility must follow in furnishing a service;

(2)   adopt adequate and reasonable standards for measuring a condition, including quantity and quality, relating to the furnishing of a service;

(3)   adopt reasonable rules for examining, testing, and measuring a service; and

(4)   adopt or approve reasonable rules, specifications, and standards to ensure the accuracy of equipment, including meters and instruments, used to measure a service.

(V.A.C.S. art. 1446c-0, Sec. 3.155(b).)

### Sec. 55.003.  RULE OR STANDARD.

(a)   A public utility may not impose a rule except as provided by this title.

(b)   A public utility may file with the commission a standard, classification, rule, or practice the utility follows.

(c)   The standard, classification, rule, or practice continues in force until:

(1)   amended by the utility; or

(2)   changed by the commission as provided by this subtitle.

(V.A.C.S. art. 1446c-0, Secs. 3.153 (part), 3.155(c).)

### Sec. 55.004.  LOCAL EXCHANGE COMPANY RULE OR PRACTICE CHANGE.

(a)   To make a change in an incumbent local exchange company's tariffed rules or practices that does not affect the company's charges or rates, the company must file the proposed change with the commission at least 35 days before the effective date of the change.  The commission may require the incumbent local exchange company to provide to ratepayers appropriate notice as determined by the commission.

(b)   The commission, on complaint by an affected person or on its own motion and after reasonable notice, may hold a hearing to determine the propriety of a change proposed under this section.  Pending the hearing and decision, the commission may suspend the change for not longer than 120 days after the date the change would otherwise be effective.  The commission shall approve, deny, or modify the change before the period of suspension expires.

(c)   In a proceeding under this section, the incumbent local exchange company has the burden of proving the proposed change:

(1)   is in the public interest; and

(2)   complies with this title.

(V.A.C.S. art. 1446c-0, Sec. 3.212.)

273

(V.A.C.S. art. 1446c-0, Secs. 3.304(b)(1), (c).)

## Sec. 55.045. ELIGIBILITY TO PETITION.

The telephone subscribers of an incumbent local exchange company exchange that serves not more than 10,000 access lines may petition the commission for expansion of the company's toll-free local calling area if:

(1)  the petitioning exchange's central switching office is located within 22 miles, using vertical and horizontal geographic coordinates, of the central switching office of the exchange requested for expanded local calling service; or

(2)  the petitioning exchange's central office is not more than 50 miles from the central office of the exchange requested for expanded local calling service and the exchanges share a community of interest.

(V.A.C.S. art. 1446c-0, Sec. 3.304(a) (part).)

## Sec. 55.046. PETITION REQUIREMENTS.

(a)  A petition under this subchapter must be signed by a number of the exchange's subscribers equal at least to the lesser of 100 of the exchange's subscribers or five percent of the exchange's subscribers.

(b)  An exchange that petitions under Section 55.045(2) must demonstrate in the petition that the exchange shares a community of interest with the requested exchange.

(c)  For purposes of this section, the relationships between exchanges that create a community of interest include:

(1)  a relationship because of schools, hospitals, local governments, or business centers; or

(2)  other relationships that would make the unavailability of expanded local calling service a hardship for the residents of the area.

(V.A.C.S. art. 1446c-0, Sec. 3.304(a) (part).)

## Sec. 55.047. BALLOTING AND CONSIDERATION.

(a)  If the commission receives a petition that complies with this subchapter, the commission shall order the incumbent local exchange company to provide ballots to the subscribers in the petitioning exchange.

(b)  The commission shall consider the request for expansion of the toll-free local calling area if at least 70 percent of the subscribers who vote do so in favor of the expansion.

(c)  The commission by rule shall provide for an expedited hearing on the issue of expansion.

(V.A.C.S. art. 1446c-0, Sec. 3.304(a) (part).)

## Sec. 55.048. CHARGES.

(a)  The incumbent local exchange company shall recover all costs incurred and all loss of revenue from an expansion of a toll-free local calling area under this subchapter through a request other than a revenue requirement showing by imposing a monthly fee under Subsection (b) or (c), or both.

(b)  The company may impose a monthly fee against each residential and business customer in the petitioning exchange.  The fee may not exceed $3.50 a line for a residential customer and $7 a line for a business customer unless the customer's toll-free local calling area includes more than five exchanges.  The company may impose an additional monthly fee of $1.50 for each exchange in excess of five.  This subsection applies regardless of the number of petitions required to obtain access to the exchanges.  A company may impose a fee under this subsection only until the company's next general rate case.

(c)  The company may impose a monthly fee against each of the company's local exchange service customers in this state.  This fee is in addition to the company's local exchange rates.

(d)  The company may not recover regulatory case expenses under this subchapter by imposing a surcharge on the subscribers of the petitioning exchange.

(V.A.C.S. art. 1446c-0, Sec. 3.304(a) (part).)

### Sec. 55.049.  EXPANSION PROHIBITED AFTER CERTAIN DATE.

On or after September 1, 2011, the commission may not order an expansion of a toll-free local calling area.

(Added by Acts 2011, 82nd Leg., R.S., ch. 98 (SB 980), § 9.)

## SUBCHAPTER D.  OPERATOR SERVICE PROVIDERS

### Sec. 55.081.  DEFINITION.

In this subchapter, "operator service" means a service using live operator or automated operator functions to handle telephone service such as toll calling using collect, third-number billing, and calling card services.  The term does not include a call for which the called party has arranged to be billed (800 service).

(V.A.C.S. art. 1446c-0, Sec. 3.052(a).)

### Sec. 55.082.  APPLICABILITY.

Except as provided by Section 55.088, this subchapter applies only to a telecommunications utility that is not a dominant carrier.

(V.A.C.S. art. 1446c-0, Sec. 3.052(h) (part).)

### Sec. 55.083.  RULES AND PROCEDURES.

(a)  The commission may adopt rules and establish procedures to enforce and implement this subchapter.

(b)  A rule adopted under this subchapter must be nondiscriminatory and designed to promote competition that facilitates consumer choice.

(V.A.C.S. art. 1446c-0, Secs. 3.052(f) (part), (h) (part).)

### Sec. 55.084.  INFORMATION DISPLAYED ON PUBLIC USE TELEPHONE.

(a)  An operator service provider shall furnish each entity with which it contracts to provide operator service a sticker, card, or other form of information approved by the commission for each telephone that:

(1)  has access to the service; and

(2)  is intended for use by the public.

(b)  The commission may grant the owner of a telephone approval for an alternative form of information.

(c)  The information must state:

(1)  the provider's name;

(2)  that the operator service provider will provide rate information on a caller's request;

(3)  that a caller, on the caller's request, will be informed of the method of access to the local exchange carrier operator; and

(4)  that a complaint about the service may be made to the provider or to the commission at the designated telephone number.

# PUC Substantive Rule 25.234

# CHAPTER 25.  SUBSTANTIVE RULES APPLICABLE TO ELECTRIC SERVICE PROVIDERS.

## Subchapter J.    COSTS, RATES AND TARIFFS.

### §25.234.   Rate Design.

(a)   Rates shall not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each class of customers, and shall be based on cost.

(b)   Rates will be determined using revenues, billing and usage data for a historical test year adjusted for known and measurable changes, and costs of service as defined in §25.231 of this title (relating to Cost of Service).

Excerpt from
*Application of Gulf States Utilities Company for
Authority to Change Rates*, Docket No. 3871,
7 P.U.C. Bull. 410 (Sep. 17, 1981)

ELECTRIC

APPLICATION OF GULF STATES
UTILITIES COMPANY FOR A                                    DOCKET NO. 3871
RATE INCREASE .

September 17, 1981

The Commission granted GSU a rate increase of $96,039,574 over unadjusted book test year revenues. It ordered the issuance of a public policy statement of the Commission on the purpose of establishing a representative cost of service in ratemaking. GSU was also ordered to perform a generation plant cost comparison study and to make all future rate case filings on a company-wide basis.

[1] PROCEDURE - MISCELLANEOUS

The Commission has consistently held that cases resolved by stipulation are not precedent of the proper resolution of issues stipulated to.

[2] RATEMAKING - COST OF SERVICE

Since rates are set prospectively only, a historic test year is used to approximate the utility's anticipated cost of operation during the period when rates will be in effect. There is an attempt to match future costs with future revenues, not recoup past costs with future revenues.

[3] RATEMAKING - COST OF SERVICE - ACCOUNTING ADJUSTMENTS

In establishing a cost of service representative of anticipated future costs, if expenses are expected to recur but not annually, it is permissible to include in cost of service a portion of the non-annual recurring cost proportionate with the time period over which the cost is anticipated to recur.

[4] RATEMAKING - COST OF SERVICE

Since ratemaking is not an exact science, often expenses are not recovered. This is not confiscation; it is a risk of doing business for which the utility is compensated in its authorized rate of return.

[5] RATEMAKING - RATE BASE - PLANT HELD FOR FUTURE USE

GUS's Blue Hills' plant site was excluded from rate base when the Company failed to prove that it would be used to benefit Texas ratepayers in the foreseeable future. Examination of its used and usefulness extended beyond the ten year standard.

[6] RATEMAKING - RATE BASE - CWIP & AFUDC

The Staff's financial criteria model was adopted to test the level of CWIP needed to maintain GSU's financial integrity, but the mid-point of the Staff's indicator ranges was chosen rather than the low end of the ranges as proposed by the Staff. This use of the mid-point was due to special conditions unique to this Company.

[7] RATEMAKING - RATE BASE - CWIP & AFUDC

GSU's Nelson 6 generation plant was specifically identified within CWIP to allow GSU to cease accruing contra AFUDC when the unit goes on line within the period when these new rates will be in effect.

[8] RATEMAKING - COST OF SERVICE - ACCOUNTING ADJUSTMENTS

The Commission adopted an experimental Staff property insurance reserve policy in which the reserve is set as a percentage of plant in service and funded by a precise formula.

[9]  RATEMAKING - COST OF SERVICE - DEPRECIATION

A five percent negative salvage value for generation plants was approved
because of escalating labor costs and stringent regulations regarding
asbestos disposal during plant decommissioning.


[10]  RATEMAKING - COST OF SERVICE - CAPITAL STRUCTURE

For the reasons recited in the Report, the Commission restructured GSU's
debt and approved a cost of debt of 10.98%.


[11]  RATEMAKING - COST OF SERVICE - RETURN ON EQUITY

For the reasons recited in the Report, the Commission approved a return
on equity of 16.5%


[12]  RATEMAKING - COST OF SERVICE - CAPITAL STRUCTURE

The Commission approved a capital structure for GSU with an equity level
in excess of the end-of-test-year level to track the Company's anticipated
capital structure during the period rates will be in effect.


[13]  RATEMAKING - COST OF SERVICE - CAPITAL STRUCTURE

GSU was authorized a return of 12.66% on its invested capital rate base.


[14]  RATEMAKING - COST OF SERVICE - ACCOUNTING ADJUSTMENTS

An attrition allowance was not authorized as requested upon a finding that
the use of the DCF model to establish return on equity takes into con-
sideration investors' expectations of inflation's impact on the Company's
future financial integrity.


[15]  RATEMAKING - RATE DESIGN - ELECTRIC

The Commission struck outright various promotional rates which GSU proposed
to phase out by forced migration marketing strategies.


[16]  MISCELLANEOUS

The Commission ordered GSU to perform a generation plant cost study under
Staff direction since the study would benefit future regulation of the
utility.


[17]  PROCEDURE - PLEADINGS

To enhance Staff review of future rate cases, all future rate filings of
GSU must be on a company-wide basis with relevant Texas costs and
functionalization factors clearly identified.


EXAMINER'S REPORT

Procedural History


411

On May 1, 1981, Gulf States Utilities Company (hereinafter referred to as "GSU" or "the Company") filed with the Commission a statement of intent to alter its retail electric rates for all customers subject to this Commission's original jurisdiction. GSU reported that 242,126 customers are located within the affected service area in Southeast Texas. GSU's statement of intent recites that revenues will be raised $131,544,472, or 33.2% in operating revenues for the test-year ended December 31, 1981. (The Examiner would note that this is an increase to adjusted test-year revenues). On May 19, 1981, GSU's proposed rate increase was suspended for 120 days beyond the otherwise legal effective date of June 5, pursuant to §43(d) of the Public Utility Regulatory Act, TEX. REV. CIV. STAT. ANN. art. 1446c (1980) (said statute hereinafter referred to as "PURA" or the "Act").

A pre-hearing conference was conducted on May 15, at which the following parties were granted intervenor status and grouped as follows. Also listed are the representatives of each party making an appearance at the hearing:

1. Governmental Entities - (Don Butler and Lane Nichols) the Cities of Beaumont, Bridge City, Calvert, Cleveland, Conroe, Kosse, Navasota, Orange, Shenandoah, Nederland, Sour Lake, Nome, China, Bevil Oaks, Madisonville, Port Arthur, Groves, Port Neches, and Anahuac; Texas Municipal League; Chambers County; and Chambers-Liberty Counties Navigation District (collectively referred to as "Cities")

2. Industrials - (Rex Van Middlesworth) Texas Industrial Energy Consumers; Big Three Industries, Inc.; E.I. duPont de Nemours & Co.; Firestone Synthetic Rubber & Latex Co.; Georgetown Texas Steel Corp.; Goodyear Tire & Rubber Co.; PPG Industries, Inc.; Temple-Eastex, Inc.; Texaco Chemical Co.; Union Carbide Corp.; and Union Oil Co. of California (collectively referred to as "TIEC")

3. Residentials - (Steven Ross) Elias Guidry, et al. (referred to as "East Texas Legal Services Group" or "ETLSG")

GSU was represented by Messrs. Cecil Johnson and Lee A. Everett. The Commission Staff was represented by Messrs. Allen King and Steve Porter and Ms. Grace Hopkins. On the motion of ETLSG, Docket No. 3871 was designated a PURPA hearing (a public hearing to specifically address rate design issues mandated by the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. §2601, et seq.). This designation was subsequently withdrawn in response to the Commission's reopening of Public Hearings of the Public Utility Commission of Texas On the Cost of Service Ratemaking Standards of §111(d)(1) of the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. §2601, et. seq., Docket No. 3437, 7 P.U.C. BULL. _____ (August 20, 1981). On the General Counsel's motion, Docket No. 3871 was also opened to an investigation into all of GSU's rates, schedules, customer classifications, service rules and regulations.

Prior to the hearing on the merits, appeals from the ratemaking ordinances of the following cities were filed and consolidated with Docket No. 3871: Madisonville, Anahuac, Willis, Franklin, New Waverly, Splendora, and Montgomery. GSU's appeal from the City of Roman Forest was not consolidated with Docket No. 3871 since it was filed on the next to the last day of the hearing and consolidation with Docket No. 3871 would have denied that city an opportunity for meaningful participation in the hearing.

The hearing on the merits convened on July 6, 1981. The presentation of testimony did not commence until the following day. During this first day, the parties negotiated several stipulations which were introduced into the record and are discussed below. The hearing was not bifurcated. It concluded on July 20, 1981.

All parties, except ETLSG, presented direct cases on some aspect of this rate case. The Cities limited their testimony to revenue requirement. GSU and the Staff presented evidence on GSU's revenue requirement as well as rate design. TIEC limited its direct cases to areas traditionally designated as rate design. ETLSG limited its participation to cross-examination of witnesses and presentation of argument. The primary focus of ETLSG's participation was rate design and cost-allocations. Four stipulations of fact were entered into by all parties and were designated as Staff Exhibits Nos. 24 and 31. A further stipulation concerning facility charges was entered into after the hearing by GSU and TIEC. All these stipulations are attached to this Report and adopted by reference.

## Opinion

### I.  Introduction

#### A.  Characteristics of the Applicant

GSU is a public electric utility providing electric utility service to major portions of Southeast Texas under a Certificate of Convenience and Necessity issued by the Public Utility Commission of Texas (hereinafter referred to as "the Commission"). The Commission has jurisdiction over GSU's Texas retail rates. The Company also provides electric utility service to major portions of Southern Louisiana with its rates for retail service in those areas subject to the regulatory jurisdiction of the Louisiana Public Service Commission (hereinafter referred to as "LPSC"). The Company's wholesale electric service rates in both states are subject to the regulatory jurisdiction of the Federal Energy Regulatory Commission (hereinafter referred to as "FERC"). GSU also distributes natural gas and sells processed steam within the State of Louisiana. It does not conduct either of these activities in Texas.

GSU operates its electric system as an integrated pool. Power generated in Louisiana is sold in Texas and vise versa. It is a member of the Southwest Power Pool and operates as an integral portion of that regional utility network. GSU purchases a large portion of its energy requirements from other members of that power pool, all of whom operate in the interstate power market. It does not have any operational interconnections or ties with members of the Energy Reliability Council of Texas or any other strictly intra-state Texas utility.

#### B.  Prior GSU Rate Cases

Docket No. 3871 is the fourth in a series of almost annual GSU rate applications. The prior GSU rate cases are Docket No. 1528 (1977), Docket No. 2677 (1979) and Docket No. 3298 (1980). Docket No. 1528 is the only other GSU rate case which went to a full contested hearing. The other two were settled by stipulations of the parties which were subsequently adopted by the Commission.

413

[1] Several of the parties herein presented arguments that various material issues must be resolved in particular manners because they were resolved in the same manner in Dockets Numbers 2677 and 3298. The Examiner would note that those cases were settled by stipulation. The issues in question were not exposed to the close scrutiny of cross-examination and rebuttal. The Commission has consistently held that cases resolved by stipulation are not precedent of the proper resolution of issues stipulated to. See: Application of Sunbelt Utilities, Docket No. 3083, 6 P.U.C. BULL. 75 (September 12, 1980). Furthermore, the stipulations themselves state that they do not propose to adopt or support any theories or resolutions of underlying issues but merely approve bottomline dollar amounts. For these reasons, the Examiner finds that any arguments presented herein that various issues must be resolved in a particular manner because of the orders in Dockets Numbers 2677 and 3298 are incorrect and are without merit. These decisions are advisory only and are not precedent for purposes of this docket.

### C. Purpose of Establishing A Cost of Service

P.U.C. SUBST. R. 052.02.03.032(a) states, "Cost of service is equal to the amount of revenue required to (1) cover all reasonable and necessary expenses properly incurred by a utility in rendering service to the public and (2) provide a fair and reasonable return on the adjusted value of invested capital used and useful in rendering such service." Throughout this case, GSU has interpretted this rule to mean that if the Company incurred any expense in the past that was reasonable at the time it was made, the Commission must allow the complete recovery of that expense in cost of service or amortize it and include the unamortized portion in rate base. In effect GSU seeks future recovery of past expenses. The Company repeatedly objected to recommendations of the Staff and the Cities to disallow various expenses as non-recurring. GSU claims that such treatment is consfiscatory.

[2] The Examiner finds that GSU is incorrect in its interpretation of the rate making process and that this issue must be discussed as a predicate for the following ratemaking recommendations. Rates are set prospectively only. Railroad Commission v. Houston Natural Gas Corp., 289 SW 2d 559 (Tex. 1956); Railroad Commission v. City of Fort Worth, 576 SW 2d 899 (Tex.Civ.App. - Austin, 1979, writ ref'd n.r.e.) A historic test year is used to approximate the utility's anticipated cost of operation during the period when rates will be in effect. When necessary to reflect changes in conditions since the test year, adjustments can be made to those historical costs for known and measurable costs which are certain to be incurred. Still there is a matching of expenses and revenues.

[3,4] In many cases, a utility will incur an expense which is not representative of expenses that can be expected on an annual basis. However, expenses of this type or general amount can often be expected to occur on a two or three year cycle. Since rates are traditionally set on a one year cost of service basis, it is reasonable to allow a portion of that nonannual recurring expense proportionate with the anticipated period of reoccurance in that single year's cost of service. Thus, one third of an expense anticipated to occur once every three years is included. This is still an attempt to match future expenses with future revenues. If the actual incurred expense in question or a similar expense cannot be anticipated to reoccur with any reasonable certainity within a given period, no allowance for that expense shall be made in the cost of service. It is not a question of not allowing the utility to recover the expense with future

414

revenues. The expense should have been recovered by revenues collected at the time the expense was incurred. Since ratemaking is not an exact science, often the expense is not recovered. This is not confiscation; it is a risk of doing business. The utility is compensated for this risk when the regulatory authority establishes a return on the utility's adjusted value of invested capital. *See further order #8, p. 450*

The Examiner would note that this theory of the principle of establishing a cost of service has never been expressly set forth in any Commission's opinion. It has not been deemed necessary in the past since it is inherent in the traditional use of a historical test year to set rates. It has been alluded to in Commission's opinions. See the discussion of rotor repairs in Application of Texas Power and Light Co., Docket No. 3780, 7 P.U.C. BULL. ____ (August 5, 1981). The Examiner would recommend, however, that the Commission adopt the preceding discussion in this opinion as a statement of policy to give guidance to GSU and other utilities in future rate cases thus simplifying those proceedings.

### II. Determination of Rate Base

#### A. Adjusted Value of Invested Capital

Section 41(a) of the Act defines adjusted value of invested capital as, "...a reasonable balance between original cost less depreciation and current cost less an adjustment for both present age and condition." GSU, the Cities, and the Staff all presented evidence on the Company's adjusted value of invested capital, including findings of current cost less an adjustment for age and condition. However, at the time of hearing, all parties entered into a stipulation that adjusted value of invested capital shall be no more than invested capital. For this reason, the parties did not cross-examine any witness on his current cost and age and condition adjustment testimony. Without such cross-examination the Examiner cannot find the current cost testimony of any witness to be credible. Adjusted value of invested capital cannot be calculated without such data. Therefore, the Examiner recommends that GSU's return in this docket be set only on the basis of invested capital. This is consistent with the stipulation of the parties.

#### B. Invested Capital

The Company, the Cities, and the Staff submitted the following calculations of invested capital, each element of which will be discussed by referenced line number:

| ITEM | GSU | CITIES | STAFF |
|------|-----|--------|-------|
| 1. Plant in Service | $ 757,256,215 | $ 757,256,000 | $ 755,362,662 |
| 2. Acc. Depreciation | (247,750,951) | (247,751,000) | (246,730,107) |
| 3. Net Plant | $ 509,505,264 | $ 509,505,000 | $ 508,632,555 |
| 4. Plant Held for Future Use | 12,811,102 | 1,206,000 | 1,209,371 |
| 5. CWIP | 492,207,593 | 295,325,000 | 325,893,824 |
| 6. Nuclear Fuel in Process | 32,145,950 | 32,146,000 | 32,145,950 |
| 7. Materials & Supplies | 6,661,518 | 4,657,000 | 6,740,634 |
| 8. Fuel Inventory | 20,820,578 | 9,089,000 | 11,199,299 |
| 9. Prepayments | 1,280,897 | 1,505,000 | 1,280,897 |
| 10. Working Capital | 8,897,074 | 2,112,000 | 7,414,717 |
| 11. Customer Deposits | (2,474,940) | (2,508,000) | (2,507,832) |
| 12. Def. Income Taxes | (65,137,774) | (62,729,000) | (65,768,290) |

415

3. PURA, §27(b) charges the Commission with fixing proper and adequate rates and methods of depreciation, amortization, or depletion of the several classes of property of each public utility. Under this provision of the Act, GSU's proposed depreciation, amortization, and depletion rates, except where the same differ from the Examiner's recommendations, are proper and must be adopted.

4. Pursuant to PURA, §40(b), GSU has the burden of proving that its proposed rates are just and reasonable. To the extent recommended by the Examiner, GSU has met this burden of proof.

5. The Examiner's recommendations herein will allow GSU to recover its reasonable and proper operating expenses together with a reasonable return on its invested capital pursuant to PURA, §39.

6. Rates designed according to the guidelines recommended by the Examiner, if properly implemented, are reasonable and non-discriminatory and should be approved by the Commission for complying with the ratemaking criteria of Article VI of the Act.

7. GSU's present rates for service in unincorporated areas and within the municipalities over which the Commission is authorized to exercise its original and appellate jurisdictions are insufficient to provide GSU with the revenues approved herein and should therefore be adjusted to conform to the rates established herein for each class of service.

8. GSU's water heating and space heating and cooling general service riders violate PURA, §45 and must be excluded from GSU's revised tariff.

9. The Commission may order GSU to perform Mr. Saathoff's recommended generation plant comparison study under the authority of PURA, §§28(1)-(3) and 29(c).

10. The Commission has the authority to require GSU to make all future rate filings on a system-wide basis as recommended by Messrs. Winkelmann and Lee under the authority of PURA, §§16 and 28.

MARK H. ZEPPA
HEARINGS EXAMINER

## ORDER

In public meeting at its offices in Austin, Texas, the Public Utility Commission of Texas finds that, after statutory notice was provided to the public and interested parties, the application in this case was processed by an Examiner who prepared a report containing Findings of Fact and Conclusions of Law, which report, with the following changes, is adopted and made a part of this Order.

448

1.  The Commission finds that GSU's proposal to allocate demand costs by the average and excess (A&E) methodology is the most appropriate recommendation in the record. Accordingly, the Examiner's proposal to allocate demand costs by the four coincident peak (4CP) methodology is rejected and GSU's A&E proposal adopted.

2.  The Commission finds that GSU has not met its burden of proof as to the reasonableness of its proposed curtailment plan; therefore, this proposal is rejected and GSU shall continue to operate under the curtailment plan currently on file at the Commission in GSU's existing tariff.

3.  The Commission finds that GSU and ETLSG entered into stipulations on the record regarding customer information pamphlets entitled "Customer Rights and Responsibilities" and the calculating of customer deposits found in the hearing Transcript at 1451-1454 which the Commission find reasonable. It is therefore ordered that those stipulations are incorporated into this Order by reference, the terms of which shall be met by the parties under Order of the Commission.

4.  The first sentence of Finding of Fact Number 21 is amended to read, "The cost allocations and rate structures proposed by the Examiner, as modified herein, will be based on sound ratemaking principles and should be adopted.

5.  Finding of Fact Number 26 shall be deleted.

6.  Conclusion of Law Number 5 is amended to read, "The Examiner's recommendations herein, as expressly modified by this Order, will allow GSU to recover its reasonable and proper operating expenses together with a reasonable return on its invested capital pursuant to PURA, §39."

7.  Conclusion of Law Number 6 is amended to read, "Rates designed according to the guidelines recommended by the Examiner, as modified herein, if properly implemented, are reasonable and non-discriminatory and should be approved by the Commission for complying with the ratemaking criteria of Article VI of the Act."

The Commission further issues the following Order:

1.  The petition of Gulf States Utilities Company (GSU) is hereby granted in part and denied in part, as set out in the Examiner's Report.

2.  GSU is hereby ordered to rerun its cost of service study, as modified to reflect the cost of service and cost allocation changes recommended by the Examiner, except as modified herein, and using the revenue adjustments approved herein. GSU shall within twenty (20) days from the date hereof submit the results of this study to the Commission for its review, showing how revenues will be allocated among rate classes. The

449

cost of service study, when rerun, shall incorporate all changes in rates, schedules, and service rules ordered herein. A copy of the study shall be served upon each of the parties hereto at the time it is filed with the Commission.

3. GSU shall file five (5) copies of its tariff, revised in accordance with the Examiner's Report and the terms of this Order, and sufficient to generate revenues no greater than those prescribed in that Report and this Order, with the Commission Secretary and one copy with each of the Intervenors within twenty (20) days of the date hereof. The Commission Staff shall have twenty (20) days from the date of the filing to review and to approve or reject the tariff. All parties to this docket shall have ten (10) days' from the date of that filing to file their objections, if any, to the revised tariff. The tariff shall be deemed approved and shall become effective upon the expiration of twenty (20) days after filing, or sooner upon notification of approval by the Commission Secretary. In the event of rejection, GSU shall have fifteen (15) additional days to file an amended tariff, with the same review procedures to again apply.

4. The revised and approved rates shall be charged only for service rendered in areas over which this Commission is exercising its original and appellate jurisdiction as of the adjournment of the hearing on the merits herein, and said rates may be charged only for service rendered after the tariff approval date. If the tariff approval date falls within GSU's normal customer billing cycle, the Company is hereby authorized to prorate customer bills according to the number of days service was provided under the applicable rate schedules.

5. This Order is deemed to be final upon the date of rendition. Approval of the revised tariff in compliance with this Order shall be deemed to be final on the date of its effectiveness either by operation of this Order or by notification from the Commission Secretary, whichever shall occur first.

6. GSU shall immediately initiate actions to conduct the generation plant cost study recommended by Mr. Saathoff under the conditions recommended by the Examiner. GSU is encouraged to complete that study before it files its next rate change application.

7. GSU is expressly ordered to make all future rate change applications on a system-wide basis pursuant to the recommendations of Messrs. Winkelmann and Lee.

8. The Examiner's discussion of the purpose for establishing a cost of service for ratemaking purposes found in §I(C) of the Examiner's Report is concurred with by the Commission and shall be adopted as a policy statement of the Commission. The Commission's Director of Public Utilities shall take such steps as are necessary to carry out this directive.

450

9. All motions, requests, applications and proposed Findings of Fact or Conclusions of Law not expressly granted herein are denied for want of merit and for being unsupported by the preponderance of the credible evidence in the record of this docket.

GEORGE M. COWDEN
GARRETT MORRIS
H. M. ROLLINS

COMMISSIONERS

MEMORANDUM DECISIONS

Gulf States Utilities Company, Docket No. 3710, Examiner's Report adopted October 30, 1981. GSU was granted a certificate amendment to encompass its 42% participation in the Big Cajun No. 2, Unit 3 coal-fired generation plant in Louisiana.

Lower Colorado River Authority, Docket No. 4033, was granted an electric certificate amendment on October 30, 1981.

Texas Electric Service Company, Docket No. 4076, was granted an electric certificate amendment on October 30, 1981.

Texas Electric Service Company, Docket No. 4078, was granted an electric certificate amendment on October 30, 1981.

## WATER/SEWER

| | |
|---|---|
| APPLICATION OF ALEXA ENTERPRISES, INC. d/b/a ENGEL UTILITY CO. FOR AUTHORITY TO INCREASE RATES WITHIN HENDERSON COUNTY | DOCKET NO. 3819 |

October 15, 1981

Rate application granted in part. Examiner's Report adopted except for reconnect fee which was reduced.

[1] PROCEDURE - NOTICE

The notice provisions of 543(a) of the Act do not require completion of the notice by publication mentioned therein prior to the time of the prehearing conference; however, Procedural Rule 052.01.00.043 indicates that such notice should be commenced at the time the Statement of Intent

451